### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEW MEXICO

DONALD J. TRUMP FOR PRESIDENT,
INC.,

        Plaintiff,

vs.                                                             Case No. 1:20-cv-01289-mv

_____

MAGGIE TOULOUSE OLIVER, in her
official capacity as Secretary of State of
New Mexico, the ELECTORS of NEW
MEXICO and the STATE CANVASSING
BOARD OF NEW MEXICO,

        Defendants.

### FIRST AMENDED MOTION FOR PRELIMINARY INJUNCTION AND
### TEMPORARY  RESTRAINING ORDER OR, ALTERNATIVELY, FOR STAY AND
### ADMINISTRATIVE STAY

1.      Pursuant to FED. R. CIV. P. 65, Donald J. Trump for President, Inc. ("Plaintiff") respectfully moves this Court to enter an administrative stay, temporary restraining order ("TRO") and preliminary injunction to enjoin the State of New Mexico, the Electors and the Secretary of State (collectively, the "Defendants") and all of their agents, officers, presidential electors, and others acting in concert from taking action to have such electors take any official action—including without limitation participating in the disposition of certificates of votes for President and Vice President that would ordinarily be performed in accordance with 3 U.S.C. 11,

that are made and signed, or have been made and signed, in accordance with 3 U.S.C. 9. until

further order of this Court and then issue a preliminary injunction or stay against their doing so

until the conclusion of this case on the merits —until further order of this Court, and to

preliminarily enjoin and to stay such actions pending the final resolution of this action on the

merit. Alternatively, the Court should reach the merits, vacate the Defendant Electors'

certifications from the 2020 election results, and remand to the state of New Mexico Legislature

pursuant to 3 U.S.C. § 2 to appoint electors.

## THE PARTIES

1.    The Trump Campaign is the official campaign committee of the President

Donald J. Trump's bid for reelection in the 2020 general election.  The Trump Campaign is

registered with and reports to the Federal Election Commission ("FEC") and maintains its

principal place of business in New York, New York.

2.    The Secretary or Secretary of State "is the chief election officer of the state,"

and in that capacity is responsible for "obtain[ing] and maintain[ing] uniformity in the

application, operation and interpretation of the Election Code."  NMSA 1978, § 1-2-1.

3.    The State Canvassing Board is comprised of the Secretary and the Governor

and Chief Justice of New Mexico, and is constitutionally empowered to "canvass and

declare the result of the election."  N.M. Const. art. V, § II.  The State Canvassing Board

"meet[s] in the state capitol on the third Tuesday after each statewide election and proceed

to approve the report of the canvass and declare the results of the election," NMSA 1978,

§ 1-13-15(A), and is also the entity responsible for correcting errors and discrepancies and

ordering recounts and rechecks in elections above the single-county level, *see id.* §§ 1-14-15(A), & -18.

**STATEMENT OF THE CASE**

4.     Lawful elections are the heart of our freedoms. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 10 (1964). Trust in the integrity of that process is the glue that binds our citizenry and the States in this Union.

5.     Elections face the competing goals of maximizing and counting *lawful* votes but minimizing and excluding *unlawful* ones. *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964); *Bush v. Gore*, 531 U.S. 98, 103 (2000) ("the votes eligible for inclusion in the certification are the votes meeting the properly established legal requirements") ("*Bush II*"); *compare* 52 U.S.C. § 20501(b)(1)-(2) (2018) *with id.* § 20501(b)(3)-(4). Moreover, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. Reviewing election results requires not only counting lawful votes but also eliminating unlawful ones.

6.     It is an understatement to say that 2020 was not a good year. In addition to a divided and partisan national mood, the country faced the COVID-19 pandemic. Certain officials in New Mexico presented the pandemic as the justification for ignoring state laws regarding absentee and mail-in voting. The State of New Mexico flooded their citizenry with hundreds of thousands of ballot applications and ballots in derogation of statutory controls as to

how they are lawfully received, evaluated, and counted. Whether well intentioned or not, these unconstitutional acts had the same *uniform effect*—they made the 2020 election less secure in  the state of New Mexico.  Those  changes are inconsistent with relevant state laws and  were made by  non-legislative entities, without  any consent by the state legislatures. The acts of these officials thus directly violated the Constitution. U.S. CONST. art. I, § 4; *id.* art. II, § 1, cl. 2.

7.    This case presents a question of law: Did the Defendant Maggie Toulouse Oliver, as Secretary of State of New Mexico, violate the Electors Clause by taking non-legislative actions to change the election rules that would govern the appointment of presidential electors? These non-legislative changes  to the state of New Mexico' election laws facilitated the  casting and counting of certain ballots in violation of  state law, which, in turn, violated the Electors Clause  of  Article II, Section 1, Clause 2 of the U.S. Constitution.  By these unlawful acts, the state of New Mexico has not  only  tainted  the  integrity  of their own citizens' vote, but their actions have also debased the votes of citizens in  New Mexico that remain loyal to the Constitution.

8.    Elections for federal office must comport with federal constitutional standards, *see Bush II*, 531 U.S.  at 103-05, and executive branch government officials  cannot subvert these constitutional requirements, no  matter their stated intent. For presidential elections,  each State must appoint its Electors to the electoral college in a manner that complies with the Constitution, specifically  the  Electors  Clause  requirement that only state *legislatures* may set the rules governing the appointment of electors and the elections upon which such appointment is based.[1]

---

[1] Subject to override by Congress, State legislatures have the  exclusive power  to  regulate  the time,  place,  and  manner  for  electing Members of Congress, *see* U.S. CONST. art. I, § 4, which is distinct from legislatures' exclusive and plenary authority on  the  appointment of

**Constitutional Background**

9.      The Electors Clause requires that each State "shall appoint" its Presidential Electors "in such Manner as the *Legislature thereof* may direct." U.S. CONST. art. II, § 1, cl. 2 (emphasis added); *cf. id.* art. I, § 4 (similar for time, place, and manner of federal legislative elections). "[T]he state legislature's power to select the manner for appointing electors is *plenary*," *Bush II*, 531 U.S. at 104 (emphasis added), and sufficiently *federal* for this Court's review. *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) ("*Bush I*"). This textual feature of our Constitution was adopted to ensure the integrity of the presidential selection process: "Nothing was more to be desired than that every practicable obstacle should be opposed to cabal, intrigue, and corruption." FEDERALIST NO. 68 (Alexander Hamilton). When a State conducts a popular election to appoint electors, the State must comply with all constitutional requirements. *Bush II*, 531 U.S. at 104. When a State fails to conduct a valid election—for any reason—"the electors may be appointed on a subsequent day in such a manner *as the legislature of such State may direct*." 3 U.S.C. § 2 (emphasis added).

**Violations of Electors Clause**

10.      As set forth in the Complaint, the Defendant New Mexico Secretary of State made significant changes to the legislatively defined election laws in the state of New Mexico. *See* Compl. at ¶¶ 29-134. Taken together, these non-legislative changes did away with statutory ballot-security measures for absentee ballots.

---

presidential electors. When non-legislative actors purport to set State election law for presidential elections, they violate both the Elections Clause and the Electors Clause.

11.     Citing the COVID-19 pandemic, Defendant Secretary of State gutted the safeguards for absentee ballots through non-legislative actions, despite knowledge that absentee ballots are "the largest source of potential voter fraud," BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, at 46 (Sept. 2005) (hereinafter, "CARTER-BAKER"), which is magnified when absentee balloting is shorn of ballot-integrity measures such as signature verification, witness requirements, or outer-envelope protections, or when absentee ballots are processed and tabulated without bipartisan observation by poll watchers.

### Factual Background of the Dominion Machines

12.     The Secretary of State has approved the use of voting equipment and software sold by Dominion Voting Systems Corporation ("Dominion") throughout New Mexico. The Dominion equipment and software has been found to be inaccurate in many states. The inaccuracies presumably existed in New Mexico as well.

13.     Expert witness, Russell James Ramsland, Jr. (Exh. 5, "Ramsland Affidavit") concludes that Dominion is responsible for fabrication of over 300,000 illegal votes in Michigan. In particular, the Ramsland Affidavit shows the "physical impossibility" of nearly 385,000 votes fabricated in four precincts on 04 November 2020, that resulted in nearly 290,000 more ballots being processed than available capacity in those four precincts, which the Ramsland Affidavit indicates is "physically impossible" (*see* Ex. 5 ¶14). The excess ballots were from "4 spikes totaling 384,733 ballots allegedly processed in a combined interval of 2 hour[s] and 38 minutes" in Wayne,

Oakland, Macomb, and Kent counties. *Id.* More specifically Mr. Ramsland's determined

that the maximum processing  capability during that interval was only 94,867 ballots, so

that "there were 289,866 more ballots  processed in the time available for processing in

the four precincts/townships, than there was  processing capacity." *Id.*      Mr. Ramsland is

a  member of the management team Allied Security Operations Group, LLC ("ASOG"), a

firm specializing in cybersecurity, OSINT and PEN testing of networks for election

security and  detecting election fraud through tampering with electronic voting systems.

    14.     Mr. Ramsland further determined that Dominion manipulated votes

through use of an "additive" or "Ranked Choice Voting"  algorithm.  The Dominion user

guide  refers to that process as the "RCV Method".  *See id.* at ¶12. In particular, the

Democracy Suite EMS Results Tally and Reporting User Guide, Chapter 11,  Settings

11.2.2., states "RCV METHOD: This will select the specific method of tabulating RCV

votes to elect a winner."   The Ramsland Affidavit also states that the Dominion machines

use fractional vote counts, with decimal places, rather than whole  numbers, which

destroys election integrity:

> For instance, blank ballots can be entered into the system and treated
> as "write-  ins."  Then the operator can enter an allocation of the
> write-ins among candidates  as he wishes.  The final result then
> awards the winner based on "points" the  algorithm in the compute,
> not actual votes.  The fact that we observed raw vote data that
> includes decimal places suggests strongly that this was, in fact, done.
> Otherwise, votes would be solely represented as  whole numbers.
> Below is an  excerpt from Dominion's direct feed to news outlets
> showing actual calculated  votes with decimals.  *Id.*

    15.     Further, there is strong reason to believe that votes were shifted from

Trump to Biden as the tabulation of the turnout performed by the Dominion machines increased, and more importantly, a change in voting share that occurred at around 2 AM on November 4, 2020, after election officials had supposedly halted counting, as described in the Ramsland Affidavit:

> Until the tabulated voter turnout reached approximately 83%, Trump was generally winning between 55% and 60% of every turnout point. **Then, after the counting was closed at 2:00 am, the situation dramatically reversed itself, starting with a series of impossible spikes shortly after counting was supposed to have stopped.** *Id.* at ¶13.

16.     Blank ballots counted through an Override Procedure on the Dominion machines appears to have been all, or nearly all, cast for Biden, as described in the Ramsland Affidavit:

> The several spikes cast solely for Biden could easily be produced in the Dominion system by pre-loading batches of blank ballots in files such as Write-Ins, then casting them all for Biden using the Override Procedure (to cast Write-In ballots) that is available to the operator of the system. A few batches of blank ballot could easily produce a reversal this extreme, a reversal that is almost as statistically difficult to explain as is the impossibility of the votes cast to number of voters described in Paragraph 11 above. *Id.*

17.     The Ramsland Affidavit also concluded that the sudden injection of votes totaling 384,733 ballots in four Michigan counties (Wayne, Oakland, Macomb, and Kent) in a 2 hour 38 minute period in the early morning of November 4 was "an impossibility, given the equipment available at the 4 reference locations (precincts/townships)." *Id.* at ¶14. In particular, the Ramsland Affidavit indicates that "94,867 ballots as the maximum number of ballots that could be processed" during that 2 hour and 38 minute period, thus

"[t]here were 289,866 more  ballots processed in the time available for processing in the four precincts, than the  capacity of the system allows." *Id.*  The Ramsland Affidavit concludes that "[t]he documented existence of the spikes are strongly indicative of a manual adjustment either by the operator of the system or an attack by outside actors." *Id.*

18.     The Ramsland Affidavit concludes that nearly 300,000 Michigan votes are illegitimate:

> [T]hese statistical anomalies and impossibilities compels the conclusion to a  reasonable degree of professional certainty that the vote count in Michigan and in  Wayne County, in particular for candidates for President contain at **least 289,866  illegal votes that must be disregarded. [emphasis added]**

19.     Accordingly, the results from the Dominion voting machines are not certifiable. This is a result of machine and/or software error, not human error.

**Factual Background of violation of the Election Code by Secretary**

20.     In 2019, the Election Code was amended by the New Mexico Legislature to allow voters a fourth option — beyond mailing them in, walking them into the county clerk's office, or walking them into a polling place — for returning their completed absentee ballots. *See* NMSA 1978, § 1-6-9(B)-(E).  That option is the "secured container," which is described in § 1-6-9(E). That subsection of the Election Code attaches a number of security requirements to the use of secured containers, including most importantly the requirement that "all secured containers shall be monitored by video surveillance cameras and the video recorded by that system shall be retained by the county clerk as a record related to voting."  *Id.* § 1-6-9(E)(3).

21.     The Election Code additionally requires that "the location of the containers and

the days and times the containers will be available to receive ballots [be] posted by the county

clerk *at least ninety days before* a statewide election." *Id.* § -9(E)(1) (emphasis added).  For

reasons that remain unclear, very few county clerks thought about setting up such containers in

time to meet the deadline, and attempts at untimely designations were rejected by the courts. *See*,

*e.g.*, Petition for Order to Post Notice of Secured Container, *In re: Bernalillo Cnty. Petition for

Secured Container*, No. D-202-CV-2020-05052 (N.M. 2d Jud. Dist. Ct. Sept. 4, 2020) (asking the

Court to allow untimely designation of a secured container, which was ultimately denied).

22.    The Secretary's solution to this problem — which also enabled her to take

advantage of federal funding earmarked for absentee-ballot drop-off boxes — was to create

another ballot-return option called the "drop box."  The word "drop box" does not appear in the

Election Code, and the only creature of statute that looks in any way like it is the "secured

container" concept from § 1-6-9(E), but the Secretary took the position that drop boxes were *not*

"secured containers."  Rather, the Secretary took the position that drop boxes were simply an

embodiment of the longstanding rule that an absentee-ballot "official mailing envelope may be

returned in person to . . . an alternate voting location, mobile alternate voting location or election

day voting location." NMSA 1978, § 1-6-9(D).  In short, her position is that there is no difference

between the longstanding practice of a voter turning in his or her ballot "in person" and a voter

turning in to a drop box placed outside the polling place.

23.    The problem with this position is that, under the Election Code, there *is* a

difference.  The section that most specifically describes the process for dropping off one's

absentee ballot at a polling place provides as follows:

24.     A voter who requested and received an absentee ballot shall be allowed to deliver the official mailing envelope containing the voter's absentee ballot on election day to any polling location in the county in which the voter is registered ***if the voter presents the official mailing envelope to the presiding judge*** before the polls close on election day. NMSA 1978, § 1-12-8.2(A) (emphasis added).

25.     Moreover, so-called ballot harvesting is illegal in New Mexico, and only the "voter, [a] caregiver to that voter or [a] member of that voter's immediate family may deliver that voter's absentee ballot to the county clerk in person or by mail; provided that the voter has subscribed the official mailing envelope of the absentee ballot." NMSA 1978, § 1-6-10.1(A); *see id.* § -10.1(B) (defining "'immediate family' [to] mean[] the spouse, children, parents or siblings of a voter"). In order to enforce that requirement, the presiding judge verifies whether the person returning the ballot is the voter and, when the ballot is being "returned by a person other than the voter, the official mailing envelope must contain the signature, printed name and relationship to the voter of the person returning the ballot." *Id.* § 1-6-9(A).

26.     This procedure was simply not followed with regard to what the Trump Campaign believes was the majority of drop boxes in New Mexico, allowing individuals to drop off multiple ballots — meaning that, by definition, they were not the voter on all of them — without speaking to a person at all. *See*, *e.g.*, Affidavit of Melissa Fryzel, *Republican Party of N.M. v. Oliver*, No. D-101-CV-2020-02344 (N.M. 1st Jud. Dist. Ct.) (sworn Oct. 27, 2020) (Exhibit 1 to this Complaint); Screenshot from M. Fryzel's Video of Taos Cnty. Courthouse Drop Box (Exhibit 2 to this Complaint); Screenshot from Luna County Courthouse dropbox.

27.     This violation of the Election Code by the Secretary breached the well-established rule that it is the *Legislature*, not the Executive (including the Secretary), that "shall regulate the manner, time and places of voting[, and that] . . . shall enact such laws as will secure the secrecy of the ballot and the purity of elections and guard against the abuse of elective franchise."  N.M. Const. art. VII, § I.  This rule is not merely one of state-constitutional dimension, but inheres in the federal Constitution, as well.  *See* U.S. Const. art. II, § 1, cl. 3 ("Each State shall appoint, in such Manner as *the Legislature thereof may direct*, a Number of Electors . . . ." (emphasis added)); *id.* art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State *by the Legislature thereof* . . . ." (emphasis added)); *Anderson v. Celebrezze*, 460 U.S. 780, 794-95 (1983) ("[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest.  For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation.").

28.     The absentee-ballot envelopes returned through a drop box should be identifiable, because for each such ballot the presiding judge should have "note[d on the ballot] that the voter delivered the absentee ballot in person on election day," and "placed [it] in a[ separate] envelope provided for delivery to the county clerk."  NMSA 1978, § 1-12-8.2(B).  The Court should order the State Canvassing Board to segregate those ballots turned in at drop boxes, coordinate the investigation of each location with drop boxes to determine whether the statutory procedures were followed, and, in cases where they were not, exclude the absentee votes of geographic precincts in which more than a trivial portion of those absentee ballots cast were submitted through

noncompliant drop boxes.

29.     The following section of the Election Code — which is reproduced here in full —
is the only section laying out voters' options for returned a completed absentee ballot for counting:

A.     When voting a mailed ballot, the voter shall secretly mark the mailed ballot in the
manner provided in the Election Code for marking paper ballots, place it in the official inner
envelope and securely seal the envelope.  The voter shall then place the official inner envelope
inside the official mailing envelope and securely seal the envelope.  The voter shall then complete
the form on the reverse of the official mailing envelope, which shall include a statement by the
voter under penalty of perjury that the facts stated in the form are true and the voter's name,
registration address and year of birth.  The voter or another person authorized by law shall then
return the official mailing envelope containing the voted ballot to the county clerk of the voter's
county of residence.  If returned by a person other than the voter, the official mailing envelope
shall contain the signature, printed name and relationship to the voter of the person returning the
ballot.

B.     The official mailing envelope may be returned by mail using the United States
postal service.  The secretary of state shall implement a free-access tracking system for each voter
to be able to see the status of the voter's mailed ballot while enroute to the voter as well as when
returned to the county clerk.

C.     The official mailing envelope may be returned using a commercial delivery
service; provided that unless the secretary of state has approved the use of a specific commercial
delivery service, the voter shall be responsible for the costs of delivery by means of such service.

D.     The official mailing envelope may be returned in person to the office of the county clerk or to an alternate voting location, mobile alternate voting location or election day voting location.

E.     The official mailing envelope may be returned by depositing the official mailing envelope in a secured container made available by the county clerk to receive voted mailed ballots for that election; provided that:

(1)     the location of the containers and the days and times the containers will be available to receive ballots are posted by the county clerk at least ninety days before a statewide election or forty-two days before a special election;

(2)     the location of a secured container is considered a polling place for purposes of electioneering too close to the polling place in violation of Section 1-20-16 NMSA 1978;

(3)     all secured containers shall be monitored by video surveillance cameras and the video recorded by that system shall be retained by the county clerk as a record related to voting pursuant to the provisions of Section 1-12-69 NMSA 1978;

(4)     signage at the location of a secured container shall inform voters and those dropping off ballots at the location:

(a)     that it is a violation of law for any person who is not an immediate family member to collect and deliver a ballot for another person;

(b)     that electioneering is prohibited within one hundred feet of the secured container; and

(c)     of the dates and approximate time that the ballots will be collected;

and

(5)     at least once a day, the county clerk or a full-time deputy county clerk shall

collect the ballots from the secured containers, register the date and time stamp on each

official mailing envelope and identify the location of the secured container in the ballot

register. NMSA 1978, § 1-6-9.

30.     The Secretary released her main guidance on the use of drop boxes in early

September.  *See* General Election 2020 Drop Box Standards & Guidance (dated Sept. 9, 2020)

(Exhibit 3 to this Complaint) ("Standards & Guidance").  She followed that document up with an

additional, multi-topic advisory referencing drop boxes in mid-October, *see* Secretary of State

and Attorney General's 2020 New Mexico General Election Voter Information Advisory at 6

(dated Oct. 14, 2020) (Exhibit 4 to this Complaint), which unfortunately some clerks appear to

have interpreted as softening the earlier Standards & Guidance (the subsequent advisory, *e.g.*,

changes references to "must remain under the direct supervision of at least two county staff or

election workers at all times" to "should have at least two workers supervising them").

31.     The Secretary has justified her establishment of drop boxes under subsection (D)

of the above statute, the generic provision allowing for the "in person" return of ballots to the

county clerk's office, an alternate or mobile alternate voting location (*i.e.*, an early-voting site),

or an election day location.  *See* Standards & Guidance at 2.  Given existence of subsection (E)

on secured containers, the historical practice of enforcing the requirements in the last sentence of

subsection (A) and in § 1-6-10.1 by having a poll worker orally verify whether the person

dropping off the ballot is the voter (and, if not, further verifying that the person is an immediate family member and that they have signed the outside of the ballot), the provisions specifically governing the receipt and processing of absentee ballots turned in to polling places, *see* ¶¶ 23-25, *supra*, the Secretary's position is completely untenable.

**Factual Background of the Safe Harbor**

32.     The "safe harbor" provision in federal law under 3 U.S.C. 5 for determination of Electors is not set by the U.S. Constitution and has been modified, and is still modifiable. The only Electoral College deadline specifically required by the U.S. Constitution is noon on January 20, the end of the current presidential term. All other deadlines — the "safe harbor" deadline of December 8 under 3 U.S.C. 5, the Electoral College voting on December 14 under 3 U.S.C. 7, and even the congressional vote count on January 6 under 3 U.S.C. 15 — are dates set by federal law. Moreover, these dates are based on antiquated technology concerns, as discussed *infra*. On the other hand, the U.S. Constitution is the highest law in the land, holding precedence over both state and federal statutes. In the event that federal law presents an obstacle to faithfully adhering to constitutional requirements, it is necessary to disregard the statutes in favor of the U.S. Constitution.

33.     More specifically, the so-called "safe harbor" provision under 3 U.S.C. 5 simply asserts that if a state has established laws governing the appointment of Electors, and a determination made according to that state law has been made at least six days prior to December 14 (the date fixed by 3 U.S.C. 7 for the Electoral College to convene), then that determination is final on December 8. The U.S. Supreme Court has ruled that the law does not actually require

states to appoint Electors by 14 December 2020 in order for those Electoral Votes to be counted by Congress when determining the winner of the presidential election. Bush v. Gore, 531 U.S. 98, 115 (2000) (Rehnquist, C.J. & Scalia & Thomas, JJ., concurring).

34.     Because New Mexico laws governing the vote were violated in numerous ways (See *infra* Argument II and III), certification of the election results cannot be said to have been made in accordance with the laws established in New Mexico. Therefore, the responsibility still rests with the New Mexico state legislature to appoint the state Electors, because no "determination made pursuant to such law" has actually been made.

35.     The U.S. Constitution instructs the states to appoint presidential Electors "in such Manner as the Legislature thereof may direct."

36.     The U.S. Constitution also grants states the authority to establish the "times, places, and manner" of elections under Art. I, § 4, cl. 1 which the New Mexico Legislature has done by crafting laws governing how elections should be conducted. Yet, the New Mexico election laws were violated by the Secretary during the 2020 presidential election cycle.

37.     Forensic examination of the ballots and absentee envelopes is necessary to determine the validity of the ballots. An enormous amount of information is available from examining ballots and absentee envelopes.

38.     Current Electoral deadlines are merely current Federal statute, not Constitutional law and has changed quite a bit over the years. In 1789 electors were appointed on the first Wednesday of January, electors met on the first Wednesday in February, and the Electoral vote was tabulated by a joint session of Congress on the first Wednesday of March pursuant to

Resolution of 13 September 1788 by the Confederation Congress. For over half a century, from 1792 until 1844, electors had to be appointed any time within the 34 days before the first Wednesday in December, and the electors met and voted on the first Wednesday in December pursuant to 1 Stat. 239, Sec 1-2. For 139 years, in every election between 1792 and 1932 except the 1876 election, the Electoral vote was tabulated by Congress on the second Wednesday in February pursuant to 1 Stat. 239, Sec 5. For 44 years, between 1888 and 1932, the Electors met and voted on the second Monday in January pursuant to 24 Stat. 373, Sec 1.

39.     A single national day for appointing electors (i.e., voting) nationally wasn't established until 1848 pursuant to 5 Stat. 721. Moreover, Tuesday was picked based on obsolete religious and agricultural concerns. In the 1800s, most citizens worked as farmers and lived far from polling places. Since it often took people at least a day to travel to a polling place, lawmakers needed a two-day window for Election day. Weekends were out of bounds because Sunday was for Church, and Wednesday was market day for farmers.

40.     Finally, current dates for Electors meeting and voting, and Congress tabulating Electoral votes, have only been Federal law since 1948 pursuant to 62 Stat. 675 3 USC 7, 15.

41.     There is precedent for delaying/changing election deadlines in the event of unclear or questionable results or other circumstances. March 4, 1789 was the earliest date on which the Electoral Vote could be formally counted by Congress during the first election, but The First Congress did not achieve a quorum in both houses (necessary in order to hold a Joint Session of the entire Congress) until 6 April 1789, so the Electoral Vote coming out of the first Presidential Election was not counted and tabulated by Congress until that date.

42.     In the 1876 election, it became apparent, well before the Tabulation Joint Session of Congress was scheduled to meet on 14 February 1877, that something was terribly wrong with the Electoral Vote coming out of the meetings of more than a few "electoral colleges" held on 6 December 1876. Not only would the Electoral Vote be close (as could be easily discerned from the reports of the popular returns in each State as already published in newspapers around the Nation,) but at least three States in the South (as it was the post-Civil War Reconstruction era) were sending two sets of Electoral Votes — one in favor of each Major Party's candidate. To make matters worse, one of these Major Parties controlled one house of the outgoing Congress, while the second Party controlled the other house leaving no possibility of a Party line vote in Congress.

43.     To this end, Congress quickly passed legislation (signed into law by outgoing President Grant on 29 January 1877) completely bypassing the usual process of Electoral Vote counting, instead requiring Congress to hold what would otherwise be the normal Tabulation Joint Session early — in this case, on 1 February 1877 — to discern just which States were in dispute. Congress then formally handed those disputes over to a so-called "Electoral Commission" consisting of Senators, Congressmen, and U.S. Supreme Court Justices appointed to the task by Congress.

44.     The earlier-than-usual meeting of Congress in Tabulation Joint Session was intended to buy the Electoral Commission more time to resolve these disputes before the looming 4 March 1877 deadline, on which date a new President would have to take office. By a combination of constitutional fiat and Federal statute, President Grant's term ended — no matter

what — on that date.

45.     A Joint Session to count and tabulate the disputed State's Electoral Vote as decided by the Electoral Commission was held on 2 March 1877, just two days before the new President, Rutherford B. Hayes, would constitutionally take office pursuant to 19 STAT 227, 29 Jan 1877.

46.     As demonstrated *supra*, there is significant flexibility and precedent in U.S. law for changing the date that electors are appointed, changing the date electors convene to vote, and changing the date electors have their vote certified by Congress.

47.     As of 14 December 2020, we are approximately half-way from Election Day to Inaugural Day. This makes such a delay very reasonable, given the violations of New Mexico election law by the Secretary of State.

48.     For the sake of American democracy and to strengthen our fraying social fabric, it is preferable to address the violations of New Mexico election law before determining who is the next President.

49.     The deadlines for the seating of electors and their voting, however, is not necessary for the effective transition of power. These deadlines were created for the convenience of travel, just as election day was placed uniformly on the first Tuesday after the first Monday in November to allow farmers to complete the fall harvest prior to voting. In other words, these dates have nothing to do with the transition of power and are largely not relevant to a time when electors do not have to ride horses to Washington, D.C. to vote. Accordingly, these dates should not interfere with state legislatures effectively investigating the management of the election, especially when we experience violations of New Mexico election laws calling into question thousands of ballots.

We have, and must take the time, to ensure integrity of this election.

50.     The U.S. Constitution explicitly assigns the power to appoint presidential Electors to the legislatures of the various states. Those state legislatures have established laws governing the conduct of elections and awarding presidential Electors according to the results of the popular vote. The "safe harbor" provision established by federal statute sets a deadline for determining Electors according to the laws in place for that purpose in each state.

51.     Because the laws governing the conduct of elections were flagrantly violated in New Mexico during the 2020 presidential election, there can be no determination of New Mexico presidential Electors pursuant to New Mexico state law. The only deadline that New Mexico state lawmakers have an obligation to meet is the one deadline set forth in the U.S. Constitution — noon on January 20, 2021. On the other hand, the designation of the "safe harbor" provision in federal law under 3 U.S.C. 5 for determination of Electors is modifiable.

**STANDARD OF REVIEW**

52.     Plaintiffs can obtain preliminary injunctions in original actions. *See California v. Texas*, 459 U.S. 1067 (1982) ("[m]otion of plaintiff for issuance of a preliminary injunction granted"); *United States v. Louisiana*, 351 U.S. 978 (1956) (enjoining named state officers "and others acting with them … from prosecuting any other case or cases involving the controversy before this Court until further order of the Court"). Similarly, a moving party can seek a stay pending appeal under this Court's Rule 23.[2]

---

[2] *See, e.g., Frank v. Walker,* 135 S.Ct. 7 (2014); *Husted v. Ohio State Conf. of the NAACP,* 135 S.Ct. 42 (2014); *North Carolina v. League of Women Voters,* 135 S.Ct. 6 (2014); *Arizona Sect'y of State's Office v. Feldman,* 137 S.Ct. 446 (2016); *North Carolina Covington*, 138 S.Ct. 974 (2018); *Republican Nat'l*

53.     Plaintiffs who seek interim relief under Federal Rule 65 must establish that they likely will succeed on the merits and likely will suffer irreparable harm without interim relief, that the balance of equities between their harm in the absence of interim relief and the defendants' harm from interim relief favors the movants, and that the public interest favors interim relief. *Winter v. Natural Resources Def. Council, Inc.,* 555 U.S. 7, 20 (2008). To obtain a stay pending appeal under this Court's Rule 23, the applicant must meet a similar test:

54.     (1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay. In close cases the Circuit Justice or the Court will balance the equities and weigh the relative harms to the applicant and to the respondent. *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010).

## ARGUMENT

### I.     THE PLAINTIFF IS LIKELY TO PREVAIL.

55.     Under the *Winter-Hollingsworth* test, the plaintiff's likelihood of prevailing is the primary factor to assess the need for interim relief. Here, the Plaintiff will prevail because this Court has jurisdiction and venue and the Plaintiff's merit case is likely to prevail.

#### A.          This Court has jurisdiction and venue over Plaintiff's claims

56.     In order to grant leave to file, this Court first must assure itself of its jurisdiction,

---

*Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205 (2020).

*Steel Co. v. Citizens for a Better Env't.,* 523 U.S. 83, 95 (1998); *cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (courts deny leave to file amended pleadings that would be futile). That standard is met here. The Plaintiff's fundamental rights and interests are at stake. This Court is a legitimate venue that can protect the Plaintiff's Electoral College votes from being cancelled by the unlawful and constitutionally tainted votes cast by Electors appointed by the state of New Mexico.

**(a).     The claims fall within this Court's constitutional and statutory subject-matter jurisdiction.**

57.     This Court has subject-matter jurisdiction under Clause 3 of Section 1 of Article II, Clause 1 of Section 4 of Article I, Clause 1 or Section 2 of Article III, and Section 1 of Amendment XIV of the Constitution of the United States, and Sections 1343 and 1331 of Title 28 and Section 1983 of Title 42 of the United States Code.

58.     This Court has personal jurisdiction over all the Defendants, as all of them reside, work, hold office, and committed the acts or will commit the acts alleged in this Complaint within the State of New Mexico, and because personal jurisdiction exists under the New Mexico long-arm statute.  See NMSA 1978, § 38-1-16.

59.     Venue in this District is proper under 28 U.S.C. §1391(b)(1) and (2), because all Defendants reside here and because a substantial part of the events or omissions giving rise to the claims occurred or will likely occur here.

60.     This Court not only is a permissible court for hearing this action; it is the only court that can hear this action quickly enough to render relief sufficient to avoid constitutionally tainted votes in the Electoral College and to place the appointment and certification of the New

Mexico states' presidential electors before their legislatures pursuant to 3 U.S.C. §§ 2, 5, and 7 in time for a vote in the House of Representatives on January 6, 2021. *See* 3 U.S.C. § 15. With that relief in place, the House can resolve the election on January 6, 2021, in time for the President to be selected by the constitutionally set date of January 20. U.S. CONST. amend. XX, § 1.

### (b).    The claims arise under the U.S. Constitution.

61.    When States violate their own election laws, they may argue that these violations are insufficiently federal to allow review in this Court. *Cf. Foster v. Chatman*, 136 S.Ct. 1737, 1745-46 (2016) (this Court lacks jurisdiction to review state-court decisions that "rest[] on an adequate and independent state law ground"). That attempted evasion would fail for two reasons.

62.    First, in the election context, a state-court remedy or a state executive's administrative action purporting to alter state election statutes implicates the Electors Clause. *See Bush II*, 531 U.S. at 105. Even a plausible federal-law defense to state action arises under federal law within the meaning of Article III. *Mesa v. California*, 489 U.S. 121, 136 (1989) (holding that "it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes"). Constitutional arising under jurisdiction exceeds statutory federal-question jurisdiction of federal district courts,[3] and—indeed— we did not even have federal-question jurisdiction until 1875.

---

[3] The statute for federal-officer removal at issue in *Mesa* omits the well-pleaded complaint rule, *id.*, which is a *statutory* restriction on federal-question jurisdiction under 28 U.S.C. § 1331. *See Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 808 (1986).

*Merrell Dow Pharm.,* 478 U.S. at 807. The Plaintiff's Electoral Clause claims arise under the Constitution and so are *federal*, even if the only claim is that the Defendants violated the state election statutes of New Mexico. Moreover, as is explained below, the Defendants' actions injure the interests of the Plaintiff in the appointment and certification of presidential electors to the Electoral College.

63.     Given this federal-law basis against these state actions, the state actions are not "independent" of the federal constitutional requirements that provide this Court jurisdiction. *Fox Film Corp. v. Muller*, 296 U.S. 207, 210-11 (1935); *cf. City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997) (noting that "even though state law creates a party's causes of action, its case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law" and collecting cases) (internal quotations and alterations omitted). Plaintiff's claims therefore fall within this Court's arising-under jurisdiction.

64.     Second, state election law is not purely a matter of state law because it applies "not only to elections to state offices, but also to the election of Presidential electors," meaning that state law operates, in part, "by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution." *Bush I*, 531 U.S. at 76. Logically, "any state authority to regulate election to [federal] offices could not precede their very creation by the Constitution," meaning that any "such power had to be delegated to, rather than reserved by, the States." *Cook v. Gralike*, 531 U.S. 510, 522 (2001) (internal quotations omitted). "It is no original prerogative of State power to appoint a representative, a senator, or President for the Union." J.

Story, 1 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 627 (3d ed. 1858). For these reasons, any "significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush II*, 531 U.S. at 113 (Rehnquist, C.J., concurring).

65.     Under these circumstances, this Court has the power both to review and to remedy a violation of the Constitution. Significantly, parties do not need winning hands to establish jurisdiction. Instead, jurisdiction exists when "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction," even if the right "will be defeated if they are given another." *Bell v. Hood*, 327 U.S. 678, 685 (1946). At least as to *jurisdiction*, a plaintiff need survive only the low threshold that "the alleged claim under the Constitution or federal statutes [not] … be immaterial and made solely for the purpose of obtaining jurisdiction or … wholly insubstantial and frivolous." *Id.* at 682. The Bill of Complaint meets that test.

### (c).     The requested relief would redress the injuries.

66.     This Court has authority to redress the Plaintiff State's injuries, and the requested relief will do so.

67.     First, while the Defendants are responsible for their elections, this Court has authority to enjoin reliance on *unconstitutional* elections:

> When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter.

68.     *Bush II*, 531 U.S. at 104; *City of Boerne v. Flores,* 521 U.S. 507, 524 (1997) ("power to interpret the Constitution in a case or controversy remains in the Judiciary"). <u>The Plaintiff does not ask this Court to decide who won the election; the Plaintiff only asks that the Court to enjoin the clear violations of the Electors Clause of the Constitution.</u>

69.     Second, a relief that the Plaintiff requests—namely, remand to the New Mexico state legislature to allocate presidential electors in a manner consistent with the Constitution— does not violate the rights of the voters of the state of New Mexico or exceed this Court's power. The power to select presidential electors is a plenary power of the State Legislature, and this remains so, without regard to state law:

> This power is conferred upon the legislatures of the States by the Constitution of the United States, and cannot be taken from them or modified by their State constitutions. Whatever provisions may be made by statute, or by the state constitution, to choose electors by the people, there is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated. *McPherson v. Blacker*, 146 U.S. 1, 35 (1892) (internal quotations omitted); *accord Bush I*, 531 U.S. at 76-77; *Bush II*, 531 U.S at 104.

70.     Third, uncertainty of how the state of New Mexico Legislature will allocate their electors is irrelevant to the question of redressability:

> If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case – even though the agency … might later, in the exercise of its lawful discretion, reach the same result for a different reason.

71.     *FEC v. Akins*, 524 U.S. 11, 25 (1998). The state of New Mexico Legislature would remain free to exercise their plenary authority under the Electors Clause in any *constitutional* manner they wish. For example, they may review the presidential election results in their State

and determine that winner would be the same, notwithstanding the violations of state law in the conduct of the election. Or they may appoint the Electors themselves, either appointing all for one presidential candidate or dividing the State's Electors and appointing some for one candidate and some for another candidate. Or they may take any number of actions that would be consistent with the Constitution. Under *Akins*, the simple act of reconsideration under lawful means is redress enough.

72. Fourth, the requested relief is consistent with federal election law: "Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct." 3 U.S.C. § 2. Regardless of the statutory deadlines for the Electoral College to vote, this Court could enjoin reliance on the results from the constitutionally tainted November 3 election, remand the appointment of Electors to the state of New Mexico, and order the state of New Mexico Legislature to certify their Electors in a manner consistent with the Constitution, which could be accomplished well in advance of the statutory deadline of January 6 for the House to count the presidential electors' votes. 3 U.S.C. § 15.

### (d).     Plaintiff has prudential standing.

73. Beyond the constitutional baseline, standing doctrine also poses prudential limits like the zone-of-interests test, *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970), and the need for those seeking to assert absent third parties' rights to have their own Article III standing and a close relationship with the absent third parties, whom a sufficient

"hindrance" keeps from asserting their rights. *Kowalski v. Tesmer*, 543 U.S. 125, 128-30 (2004). Prudential doctrines pose no barrier here.

74.     First, even if *parens patriae* standing were not available, the state of New Mexico has their own injury because of their close relationship with their citizens, and citizens may arguably lack standing to assert injuries under the Electors Clause. *See*, *e.g.*, *Bognet v. Sec'y Pa.*, No. 20-3214, 2020 U.S. App. LEXIS 35639, at *18-26 (3d Cir. Nov. 13, 2020). The state of New Mexico, by contrast, has standing to assert such injuries. *Lance*, 549 U.S. at 442 (distinguishing citizen plaintiffs who suffer a generalized grievance from citizen relators who sued in the name of a state); *cf. Massachusetts,* 549 U.S. at 520 (federal courts owe "special solicitude in standing analysis"). Moreover, anything beyond Article III is merely prudential. *Caplin & Drysdale v. United States*, 491 U.S. 617, 623 n.3 (1989). Thus, the state of New Mexico also has third-party standing to assert their citizens' injuries.

### (e).     This action is not moot and will not become moot.

75.     There would be ample time for the state of New Mexico Legislature to appoint new presidential electors in a manner consistent with the Constitution. Any remedial action can be completed well before January 6, 2020. Indeed, even the swearing in of the next President on January 20, 2021, will not moot this case because review could outlast even the selection of the next President under "the 'capable of repetition, yet evading review' doctrine," which applies "in the context of election cases … when there are 'as applied' challenges as well as in the more typical case involving only facial attacks." *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 463 (2007) (internal quotations omitted); *accord Norman v. Reed*, 502 U.S. 279, 287-88

(1992). Mootness is not, and will not become, an issue here.

### (f).   This matter is ripe for review.

76.   The Plaintiff's claims are clearly ripe now, but they were not ripe before the election: "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotations and citations omitted).[4] Prior to the election, there was no reason to know who would win the vote in the state of New Mexico.

77.   Ripeness also raises the question of laches, which Justice Blackmun called "precisely the opposite argument" from ripeness. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 915 n.16 (1990) (Blackmun, J., dissenting). Laches is an equitable defense against unreasonable delay in commencing suit. *Petrella v. MGM*, 572 U.S. 663, 667 (2014). This action was neither unreasonably delayed nor is prejudicial to the Defendants.

78.   Before the election, the Plaintiff had no ripe claim against the Defendants:

> "One cannot be guilty of laches until his right ripens into one entitled to protection. For only then can his torpor be deemed inexcusable."

79.   *What-A-Burger of Va., Inc. v. Whataburger, Inc.*, 357 F.3d 441, 449-50 (4th Cir. 2004) (quoting 5 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31: 19 (4th ed. 2003); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 777 (Fed. Cir. 1995) (same); *Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic &*

---

[4] It is less clear whether this matter became ripe on or soon after election night when the networks "called" the election for Mr. Biden or significantly later when enough States certified their vote totals to give him 270-plus anticipated votes in the electoral college.

*Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002) (same). The Plaintiff could not have brought this action before the election results. Nor did the full extent of the county-level deviations from election statutes in the state of New Mexico become evident until days after the election. The Board of Canvassers did not finalize election results until November 24, 2020. Moreover, the Plaintiff may reasonably assess the status of litigation commenced by candidates to the presidential election prior to commencing its own litigation. Neither ripeness nor laches presents a timing problem here.

### (g).   This action does not raise a non-justiciable political question.

80.    The "political questions doctrine" does not apply here. Under that doctrine, federal courts will decline to review issues that the Constitution delegates to one of the other branches—the "political branches"—of government. While appointing presidential electors involves political rights, this Court has ruled in a line of cases beginning with *Baker* that constitutional claims related to voting (other than claims brought under the Guaranty Clause of Article IV, §4) are justiciable in the federal courts. As the Court held in *Baker*, litigation over political rights is not the same as a political question:

> We hold that this challenge to an apportionment presents no nonjusticiable "political question." The mere fact that the suit seeks protection of a political right does not mean it presents a political question. Such an objection "is little more than a play upon words."

81.    *Baker*, 369 U.S. at 209. This is no political question; it is a constitutional one that this Court should answer.

### (h).   No adequate alternate remedy or forum exists.

82.     To the extent that the state of New Mexico wishes to avail themselves of 3 U.S.C.

§ 5's safe harbor, *Bush I*, 531 U.S. at 77-78, this action will not meaningfully stand in their way:

> The State, of course, after granting the franchise in the special context
> of Article II, can take back the power to appoint electors. … There is no
> doubt of the right of the legislature to resume the power at any time, for it
> can neither be taken away nor abdicated[.]

83.     *Bush II*, 531 U.S. at 104 (citations and internal quotations omitted).[5] The New

Mexico legislature will remain free under the Constitution to appoint electors or vote in any

*constitutional* manner they wish. The only thing that they cannot do—and should not wish to

do—is to rely on an allocation conducted in violation of the Constitution to determine the

appointment of presidential electors.

84.     Moreover, if this Court agrees with the Plaintiff that the New Mexico's

appointment of presidential electors under the recently conducted elections would be

unconstitutional, then the statutorily created safe harbor cannot be used as a justification for

a violation of the Constitution. The safe-harbor framework created by statute would have to

yield in order to ensure that the Constitution was not violated.

85.     It is of no moment that Defendants' *state laws* may purport to tether state

legislatures to popular votes. Those state limits on a state legislature's exercising federal

constitutional functions cannot block action because the U.S. Constitution "transcends any

limitations sought to be imposed by the people of a State" under this Court's precedents. *Leser*

---

[5] Indeed, the Constitution also includes another backstop: "if no person have such majority [of electoral votes], then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot." U.S. CONST. amend. XII.

*v. Garnett*, 258 U.S. 130, 137 (1922); *see also Bush I*, 531 U.S. at 77; *United States Term Limits v. Thornton*, 514 U.S. 779, 805 (1995) ("the power to regulate the incidents of the federal system is not a reserved power of the States, but rather is delegated by the Constitution").

86.    As this U.S. Supreme Court recognized in *McPherson v. Blacker*, the authority to choose presidential electors:

> is conferred upon the legislatures of the states by the Constitution of the United States, and cannot be taken from them or modified by their state constitutions. ... *Whatever provisions may be made by statute, or by the state constitution, to choose electors by the people, there is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away or abdicated.*

87.    146 U.S. 1, 35 (1892) (emphasis added) (internal quotations omitted). The Defendants and the state of New Mexico would suffer no cognizable injury from this Court's enjoining their reliance on an unconstitutional vote.

**B.  The Plaintiff is likely to prevail on the merits.**

88.    For interim relief, the most important factor is the likelihood of movants' prevailing. *Winter*, 555 U.S. at 20.

89.    The Defendants' administration of the 2020 election violated the Electors Clause, which renders invalid any appointment of presidential electors based upon those election results. For example, even without fraud or nefarious intent, a mail-in vote not subjected to the State legislature's ballot-integrity measures cannot be counted. It does not matter that a judicial or executive officer sought to bypass that screening in response to the COVID pandemic: the choice was not theirs to make. "Government is not free to disregard the [the Constitution] in times

of crisis." *Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, 592 U.S. (Nov. 25, 2020) (Gorsuch, J., concurring). With all unlawful votes discounted, the election result is an open question that this Court must address. Under 3 U.S.C. § 2, the New Mexico state legislature may answer the question, but the question must be asked here.

(a).    **Defendant Secretary violated the Electors Clause by modifying the legislatures' election laws through non-legislative action.**

90.    The Electors Clause grants authority to *State Legislatures* under both horizontal and vertical separation of powers. It provides authority to each State—not to federal actors— the authority to dictate the manner of selecting presidential electors. And within each State, it explicitly allocates that authority to a single branch of State government: to the "Legislature thereof." U.S. Const. Art. II, § 1, cl. 2. state legislatures' primacy *vis-à-vis* non-legislative actors—whether State or federal—is even more significant than congressional primacy *vis-à-vis* state legislatures.

91.    The State legislatures' authority is plenary. *Bush II*, 531 U.S. at 104. It "cannot be taken from them or modified" even through "their state constitutions." *McPherson*, 146 U.S. at 35; *Bush I*, 531 U.S at 76-77; *Bush II*, 531 U.S at 104. The Framers allocated election authority to State legislatures as the branch closest—and most accountable—to the People. *See*, *e.g.*, Robert G. Natelson, *The Original Scope of the Congressional Power to Regulate Elections*, 13 U. PA.J. CONST. L. 1, 31 (2010) (collecting Founding-era documents); *cf.* THE FEDERALIST NO. 57, at 350 (C. Rossiter, ed. 2003) (Madison, J.) ("House of Representatives is so constituted as to support in its members an habitual recollection of their

dependence on the people"). Thus, only the State legislatures are permitted to create or modify the respective State's rules for the appointment of presidential electors. U.S. CONST. art. II, § 1, cl. 2.

92.     Regulating election procedures is necessary both to avoid chaos and to ensure fairness:

> Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.

93.     *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (interior quotations omitted). Thus, for example, deadlines are necessary to avoid chaos, even if some votes sent via absentee ballot do not arrive timely. *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973). Even more importantly in this pandemic year with expanded mail-in voting, ballot-integrity measures—*e.g.*, witness requirements, signature verification, and the like—are an essential component of any legislative expansion of mail-in voting. *See* CARTER-BAKER, at 46 (absentee ballots are "the largest source of potential voter fraud"). Though it may be tempting to permit a breakdown of the constitutional order in the face of a global pandemic, the rule of law demands otherwise.

94.     Specifically, because the Electors Clause makes clear that state legislative authority is exclusive, non-legislative actors lack authority to *amend* statutes. *Republican Party of Pa. v. Boockvar*, No. 20-542, 2020 U.S. LEXIS 5188, at *4 (Oct. 28, 2020) ("there is a strong likelihood that the State Supreme Court decision violates the Federal Constitution") (Alito, J., concurring); *Wisconsin State Legis.*, No. 20A66, 2020 U.S. LEXIS 5187, at *11-14

(Oct. 26, 2020) (Kavanaugh, J., concurring in denial of application to vacate stay); *cf. Grayned v. City of Rockford,* 408 U.S. 104, 110 (1972) ("it is not within our power to construe and narrow state laws"); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 509-10 (2010) ("editorial freedom … [to "blue-pencil" statutes] belongs to the Legislature, not the Judiciary"). That said, courts can enjoin elections or even enforcement of *unconstitutional* election laws, but they cannot rewrite the law in federal presidential elections.

95.     For example, if a state court enjoins or modifies ballot-integrity measures adopted to allow absentee or mail-in voting, that invalidates ballots cast under the relaxed standard unless the legislature has—prior to the election—ratified the new procedure. Without pre-election legislative ratification, results based on the treatment and tabulation of votes done in violation of state law cannot be used to appoint presidential electors.

96.     Elections must be lawful contests, but they should not be mere *litigation contests* where the side with the most lawyers wins. As with the explosion of nation-wide injunctions, the explosion of challenges to State election law for partisan advantage in the lead-up to the 2020 election "is not normal." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of stay). Nor is it healthy. Under the "*Purcell* principle," federal courts generally avoid enjoining state election laws in the period close to an election. *Purcell*, 549 U.S. at 4-5 (citing "voter confusion and consequent incentive to remain away from the polls"). *Purcell* raises valid concerns about confusion in the run-up to elections, but judicial election-related injunctions also raise *post-election* concerns. For example, if a state court enjoins ballot-integrity measures adopted to secure absentee or mail-in voting, that

invalidates ballots cast under the relaxed standard unless the State legislature has had time to ratify the new procedure. Without either pre-election legislative ratification or a severability clause in the legislation that created the rules for absentee voting by mail, the state court's actions operate to violate the Electors Clause.

### (b). State and local administrator's systemic failure to follow State election law qualifies as an unlawful amendment of State law.

97.     When non-legislative state and local executive actors engage in systemic or intentional failure to comply with their State's duly enacted election laws, they adopt by executive fiat a *de facto* equivalent of an impermissible amendment of State election law by an executive or judicial officer. *See* Section II.B.1, *supra*. This Court recognizes an executive's "consciously and expressly adopt[ing] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities" as another form of reviewable final action, even if the policy is not a written policy. *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985) (interior quotations omitted); *accord id.* at 839 (Brennan, J., concurring). Without a *bona fide* amendment to State election law *by the legislature*, executive officers must follow state law. *Cf. Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *Service v. Dulles*, 354 U.S. 363, 388-89 (1957). The wrinkle here is that the non-legislative actors lack the authority under the federal Constitution to enact a *bona fide* amendment, regardless of whatever COVID-related emergency power they may have.[6]

---

[6] To advance the principles enunciated in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (concerning state police power to enforce compulsory vaccination laws), as authority for non-legislative state actors re-writing state election statutes—in direct conflict with the Electors

98.     This form of executive nullification of State law by  statewide, county, or city officers is a variant of  impermissible amendment by a non-legislative actor.  *See* Section II.B.1, *supra*. Such nullification is always  unconstitutional, but it is especially egregious when it eliminates legislative safeguards for election integrity  (*e.g.*, signature and witness requirements for absentee ballots, poll watchers[7]). Systemic failure by statewide, county, or city election officials to  follow  State election law is no more permissible than formal  amendments by an executive or judicial actor.

## II.     THE OTHER *WINTER-HOLLINGSWORTH* FACTORS WARRANT INTERIM RELIEF.

99.     Although Plaintiff's likelihood of prevailing  would alone justify granting interim relief, relief is also warranted by the other *Winter-Hollingsworth*  factors.

### A.     Plaintiff will suffer irreparable harm if the New Mexico state unconstitutional presidential electors  vote in the Electoral College.

100.     Allowing the unconstitutional election results in the state of New Mexico

---

Clause—is a nonstarter. Clearly,  "the Constitution does not conflict with itself by conferring, upon  the one hand, a … power, and taking the same power away, on the other, by the limitations of the due  process clause." *Brushaber v. Union Pac. R. Co.*, 240 U.S. 1, 24 (1916). In other words, the States' reserved police power does not abrogate the  Constitution's express Electors Clause. *See also Cook v. Gralike*,  531 U.S. at 522 (election authority is delegated  to States, not  reserved by them); *accord* Story, 1 COMMENTARIES § 627.

[7] Poll watchers are "prophylactic measures designed to prevent election fraud," *Harris v. Conradi*, 675 F.2d 1212, 1216 n.10 (11th Cir. 1982), and "to insure against tampering with  the voting process." *Baer v. Meyer,* 728 F.2d 471, 476 (10th Cir. 1984). For example, poll monitors reported that 199 Chicago voters cast 300 party-line Democratic votes, as well as three party-line Republican votes in one election. *Barr v. Chatman,*  397 F.2d 515, 515-16 & n.3 (7th Cir. 1968).

to proceed would irreparably harm Plaintiff and the voters of New Mexico both by denying

representation in the presidency and in the Senate in the near term and by permanently sowing

distrust in federal elections. The U.S. Supreme Court has found such threats to constitute irreparable

harm on numerous occasions. *See* note 2, *supra* (collecting cases). The stakes in this case are too

high to ignore.

>        **B.**          **The balance of equities tips to the Plaintiff.**

101.    All State parties represent citizens who voted in the 2020 presidential election.

Because of their unconstitutional actions, the state of New Mexico represents some citizens who

cast ballots not in compliance with the Electors Clause. It does not disenfranchise anyone to require

the State legislatures to attempt to resolve this matter as 3 U.S.C. § 2, the Electors Clause, and

even the Twelfth Amendment provide. By contrast, it would irreparably harm Plaintiff if the

Court denied interim relief.

102.    In addition to ensuring that the 2020 presidential election is resolved in a manner

consistent with the Constitution, this Court must review the violations that occurred in the

state of New Mexico to enable Congress and State legislatures to avoid future chaos and

constitutional violations. Unless this Court acts to review this presidential election, these

unconstitutional and unilateral violations of state election laws will continue in the future.

>       **The public interest favors interim relief.**

103.    The last *Winter* factor is the public interest. When parties dispute the lawfulness of

government action, the public interest collapses into the merits. *ACLU v. Ashcroft*, 322 F.3d 240,

247 (3d Cir. 2003); *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); *League of Women*

*Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). If the Court agrees with Plaintiff that non-legislative actors lack authority to amend state statutes for selecting presidential electors, the public interest requires interim relief. Withholding relief would leave a taint over the election, disenfranchise voters, and lead to still more electoral legerdemain in future elections.

104.  Electoral integrity ensures the legitimacy of not just our governmental institutions, but the Republic itself. *See Wesberry*, 376 U.S. at 10. "Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell,* 549 U.S. at 4. Against that backdrop, few cases could warrant this Court's review more than this extraordinary case arising from a presidential election. In addition, the constitutionality of the process for selecting the President is of extreme national importance. If the Defendants are permitted to violate the requirements of the Constitution in the appointment of their presidential electors, the resulting vote of the Electoral College not only lacks constitutional legitimacy, but the Constitution itself will be forever sullied.

105.  The nation needs this Court's clarity: "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). While isolated irregularities could be "garden-variety" election irregularities that do not raise a federal question,[8] the unconstitutional setting-aside of state election statutes by non-legislative actors calls both the result and the process into question, requiring this Court's

---

[8] "To be sure, 'garden variety election irregularities' may not present facts sufficient to offend the Constitution's guarantee of due process[.]" *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 232 (6th Cir. 2011) (quoting *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)).

"unsought responsibility to resolve the federal  and constitutional issues the judicial system has been forced to confront." *Bush II*, 531 U.S. at 111.  The public interest requires this Court's action.

### III.    THE SECRETARY'S ESTABLISHMENT OF DROP BOXES VIOLATED THE NEW MEXICO LEGISLATURE'S FEDERALLY CONSTITUTIONALLY MANDATED SUPREMACY TO DIRECT THE MANNER OF CONDUCTING PRESIDENTIAL ELECTIONS

106.    Pursuant to Rule 1-010(C) NMRA, the Plaintiff incorporates by reference all of the foregoing allegations in this Complaint.

107.    Horizontal separation of powers — *i.e.*, the relationship among the legislature, executive, and judiciary at a single level of government — inheres in both the federal and state constitutions, and is in fact explicit in the state constitution.  *See* N.M. Const. art. III, § 1.  A state's maintenance of its own horizontal separation of powers, however, is not normally justiciable in the federal courts as a matter of vertical separation of powers (*i.e.*, federalism); the one federal constitutional provision that appears to allow the federal government to regulate states' internal structures (as opposed to just forbidding certain acts like bills of attainder and *ex post facto* laws), the provision that the "United States shall guarantee to every State in this Union a Republican Form of Government," U.S. Const. art. IV, § 4, has been consistently interpreted by the U.S. Supreme Court to present a political question, non-justiciable by the federal courts, *see Luther v. Borden*, 48 U.S. (7 How.) 1 (1849).

108.    With regard to the rules governing elections to federal office, however, the U.S. Constitution specifically divides responsibility between Congress and the state *legislatures*.  With

regard to congressional elections, "the Times, Places and Manner of holding Elections . . . shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations."  U.S. Const. art I, § 4, cl. 1.  With regard to the presidential elections, "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors," and "[t]he Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." U.S. Const. art. II, § 1, cls. 3 & 5.

109.    Given this federal constitutional mandate, even a state *judicial* ruling 'interpreting' a state election law beyond its reasonable limits — let alone making 'equitable' modifications to statutory law — can be held, by a federal court, to violate the state's election law as promulgated by the legislature.  Three Supreme Court justices said as much in *Bush v. Gore*:

> [T]he Florida Supreme Court's interpretation of the Florida election laws impermissibly distorted them beyond what a fair reading required, in violation of Article II.

> This inquiry does not imply a disrespect for state *courts* but rather a respect for the constitutionally prescribed role of state *legislatures*.  To attach definitive weight to the pronouncement of a state court, when the very question at issue is whether the court has actually departed from the statutory meaning, would be to abdicate our responsibility to enforce the explicit requirements of Article II.

> 531 U.S. 98, 115 (2000) (Rehnquist, C.J. & Scalia & Thomas, JJ., concurring).

110.    The Secretary acted ultra vires as an *executive* override of the legislatively enacted Election Code, which is certainly entitled to even less judicial deference in federal court — both given that the courts' interpretations of the Election Code take precedence over the executive's under ordinary separation-of-powers principles, and given that the federal

judicial review of state-level executive's decisions do not produce federal-state comity issues
or contradict established principles of *res judicata* or state-court supremacy on issues of state
law.

111.    The "safe harbor" provision in federal law under 3 U.S.C. 5 for determination of
Electors by 08 December 2020 is not set by the U.S. Constitution and can be modified as show in
paragraphs 32-51 *supra*, by delaying the selection of Electors until the Relief has been granted.
As such, the Secretary's override of the legislatively enacted Election Code must be undone, with as much
respect as possible for the rights of those voters who returned their ballots in good-faith reliance on the
Secretary's illegal representations.  *See* Prayer for Relief, *infra*.

## IV.      THE DOMINION VOTING MACHINES VIOLATE ALL
## REASONABLE STANDARDS OF ELECTORAL INTEGRITY

112.    The Ramsfeld Affidavit shows that no reasonable reliance can be made on vote
counts by the Dominion Voting machines, by any standard of proof, not even a preponderance of
evidence, until a full forensic security analysis of the Dominion voting machines used in the State
of New Mexico in the 2020 Fall election is performed.

## V.       ALTERNATIVELY, THIS CASE WARRANTS SUMMARY
## DISPOSITION.

113.    In lieu of granting interim relief, this Court could  simply reach the merits
summarily. *Cf.* FED. R. CIV. P.  65(a)(2); S.Ct. Rule 17.5. Two things are clear from the  evidence
presented at this initial phase: (1) non-legislative actors modified the election  statutes of the
state of New Mexico;  and  (2) the resulting uncertainty casts doubt on the lawful winner. Those

two facts are enough to decide the merits of the Electors Clause claim. The Court should thus vacate the appointment and certifications of New Mexico state presidential electors and remand to the State legislatures to allocate presidential electors via any constitutional means that does not rely on 2020 election results that include votes cast in violation of State election statutes in place on Election Day.

## PRAYER FOR RELIEF

Plaintiff Donald J. Trump for President, Inc. hereby prays that this Court grant the following forms of relief:

A.  The Court should order to the Defendant Secretary emergency confiscation and preservation of all Dominion voting machines and software owned or operated by government agencies in the state of New Mexico, and order to a third party cybersecurity organization having no influence or connection to Dominion, a forensic examination and analysis of the Dominion voting machines to determine their electoral integrity.

B.  The Court should order a temporary restraining order to the Defendant Secretary and the Defendant Electors of the state of New Mexico to delay disposition of certificates of votes for President and Vice President that would ordinarily be performed in accordance with 3 U.S.C. 11, that are made and signed, or will be made and signed, in accordance with 3 U.S.C. 9. until further order of this Court and then issue a preliminary injunction or stay against their doing so until the conclusion of this case on the merits Alternatively, the Court should reach the

merits, vacate the Defendant Electors' certifications from the unconstitutional 2020 election results, and remand to the state of New Mexico Legislature pursuant to 3 U.S.C. § 2 to appoint electors.

C.      The Court should order Defendants to order a decree mandating the review described in ¶¶ C-D, *infra* in time to allow the Executive of New Mexico and the Defendant Electors to perform their duties pursuant to 3 U.S.C. 6-11 in order to deliver the Defendant Electors' certificates of vote to Congress no later than 05 January 2020 in anticipation of the counting of votes by Congress on 06 January 2020 pursuant to 3 U.S.C. 15.

D.      The Court should order Defendant Secretary Maggie Toulouse Oliver to coordinate and execute a statewide canvass of absentee votes and investigation of drop boxes, in time to allow the Executive of New Mexico and the Defendant Electors to perform their duties pursuant to 3 U.S.C. 6-11 in order to deliver the Defendant Electors' certificates of vote to Congress no later than 05 January 2020 in anticipation of the counting of votes by Congress on 06 January 2020 pursuant to 3 U.S.C. 15, the canvas that includes the following:

    1.      investigation of each polling site with a drop box at which absentee ballots were returned — to determine whether the drop box in question was operated in substantial compliance with NMSA 1978, §§ 1-6-9(A), -9(E)(3), -10.1(A) & 1-12-

8.2(B), including the requirements that (i) the drop box by physically monitored by two bipartisan poll workers at all times; (ii) all persons seeking to deposit ballots be asked whether they are the voter and, if not, whether they are a caretaker of the voter and made to sign the ballot if so; (iii) the presiding judge make annotations on all ballots so delivered, marking them as having been dropped off at the polling site so as to allow for subsequent identification; and (iv) the drop box was "monitored by video surveillance cameras and the video recorded by that system shall be retained by the county clerk";

2.      identification and segregation of all absentee ballots cast through a drop box (meaning, as a practical matter, marked as having been returned in person to a polling place with a drop box on site) identified as failing to comply with the requirements of ¶ C(1), *supra*;[9]

3.      attempting to contact all putative voters casting those absentee ballots referenced in ¶ C(2), *supra*, to confirm that they in fact filled out their own ballot, sealed it in the absentee envelope, and either dropped it off personally or entrusted it to an

---

[9] This information is not tracked in the county-level absentee ballot registers and must be obtained from viewing the outside of the ballot envelope.

immediate family member or caretaker — and that the name

of the family member or caretaker given matches the name on

the outside of the ballot; and

4.      the production of a spreadsheet or register that breaks down all

statewide absentee voters (each with his or her own row)

referenced in ¶ C(2), *supra*, by county, precinct of voter, the

specific drop box the ballot was delivered to and the date of

the delivery (if available),[10] and the voter's answers to the

questions in ¶ C(3), *supra* (each with its own column).

E.      The Court should further order the invalidation of all results from whatever

the smallest block of absentee ballots is that can be precisely matched to its

election *results* — which could be as small as a drop box, or could be a

geographic precinct of absentee voters if some precinct in a county had no

illegal drop-box ballots, or could be as large as an entire county of absentee

votes — that contains ballots referenced in ¶ C(2), *supra*, and whose voters

told elections officials, when asked the questions in ¶ C(3), *supra*, that one or

more statutory provision was not met as to the voter's absentee ballot.

Date:  22 December 2020                            Respectfully submitted,

                                                   */s/ Mark Caruso*
                                                   Mark J. Caruso (NM #4459)

---

[10] While the date on which a ballot was dropped off should be ascertainable (drop boxes are cleared nightly), as should, obviously, the location of the drop box in which a given ballot was placed, the Plaintiff unfortunately does not believe that that information is trackable at this time.

Caruso Law Offices, PC
4302 Carlisle Blvd NE
Albuquerque, NM 87107-4811
505-883-5000
mark@carusolaw.com

Michael Smith (DC # 478674)
433 Belle Grove Dr.
PO box 833022, Richardson TX 75080
(641) 715-3900, extension 216162#
michael@taalaw.com

*Attorneys for the Plaintiff*

**<u>Exhibit List</u>**

Ex. 1:  Affidavit of M. Fryzel Re: Taos County Drop Box (2 pages)
Ex. 2:  Screenshot from M. Fryzel's Video of Taos County Drop Box (1 page)
Ex. 3:  SOS Standards & Guidance on Drop Boxes (11 pages)
Ex. 4:  Drop-Box Excerpt from SOS Advisory on Various Subjects (2 pages)
Ex. 5:  Ramsland Affidavit (8 pages)
Ex. 6:  Screenshot from Luna County Courthouse dropbox (1 page)