**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


**DONALD J. TRUMP FOR PRESIDENT, INC.,**

       **Plaintiff,**

**vs.**                                              **Case No. 1:20-cv-01289**

**MAGGIE TOULOUSE OLIVER, in her
official capacity as Secretary of State of
New Mexico, the ELECTORS of NEW
MEXICO and the STATE CANVASSING
BOARD OF NEW MEXICO**


**<u>COMBINED MOTION TO DISMISS AND RESPONSE TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER OR,
ALTERNATIVELY, FOR STAY</u>**

In New Mexico, roughly sixty-eight percent of registered voters cast ballots in the 2020 General Election. That amounts to 928,230 New Mexicans who voted either in person or by absentee ballot. These votes were counted, twice verified, and certified by 33 county clerks and the State Canvassing Board. On November 24, the Governor sent the winning slate of Presidential Electors to the Archivist of the United States, confirming New Mexico's votes for the successful candidates. On December 14, 2020, the Presidential Electors voted, certified and submitted their votes for Joe Biden and Kamala Harris to federal officials as required by law. The 2020 Presidential Election is over.

On November 12, 2020, members of the Trump Administration's Election Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees confirmed that the "November 3rd election was the most secure in American history."[1] They went on to say, "While we know there are many unfounded claims and opportunities for misinformation about the process of our elections, we can assure you we have the utmost confidence in the security and integrity of our elections, and you should too." *Id.*

Against this backdrop, the Trump Campaign filed this lawsuit on December 14—the same day New Mexico's Presidential Electors voted and transmitted their votes to the relevant federal officials (after they had completed these tasks). Somehow, at that moment—well over a month after the November 3 election, and more than three months after the New Mexico Secretary of State ("Secretary") issued the guidance regarding drop boxes that is the entire basis of the

---

[1] *Joint Statement from GCC and the Election Infrastructure Sector Coordinating Executive Committees* (November 12, 2020) available at https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election. (last visited on December 24, 2020)

Campaign's original complaint—the Campaign finally got around to filing this lawsuit. Doc. 1. Yet another week later, and despite claiming a need for the utmost expediency in resolving this matter, the Campaign filed an amended complaint and motion raising new allegations regarding New Mexico's use of Dominion voting machines—based entirely on a so-called expert report detailing purported problems with *Michigan's* use of voting machines that has *previously been rejected* by another court. Doc. 9; *see King v. Whitmer*, No. 2:20-cv-13134 (E.D. Mich, Nov. 25, 2020).

The weeks since November 3 have seen a raft of meritless election challenges across the country, to be sure. This lawsuit is among the most outrageous, raising wholly unsubstantiated claims in support of an extraordinary remedy that has already been rejected by state and federal courts across the country.

The Trump Campaign's core allegation in this lawsuit is that state election administrators' use of drop boxes in the 2020 election, following guidance issued by the Secretary on September 9, 2020 (the "Drop Box Guidance," Doc. 1, Ex. 3), was without consent by the New Mexico Legislature and thus violated the U.S. Constitution. This allegation is flat wrong, based on a fundamental misunderstanding of New Mexico law. The amended complaint's new allegations of alleged irregularities with Dominion voting machines in *Michigan* are simply nonsensical.

As for the requested remedy, it is stunning in its reach, calling for the reversal of the election results in New Mexico and disenfranchisement of the 928,230 voters who cast ballots in the 2020 presidential election here, with no legal basis to do so. As a Justice of the Wisconsin Supreme Court said in rejecting the same request in Wisconsin:

> Such a move would appear to be unprecedented in American history. . . . The relief being sought by the petitioners is the most dramatic invocation of judicial power I

> have ever seen. . . . [I]f there is a sufficient basis to invalidate an election, it must
> be established with evidence and arguments commensurate with the scale of the
> claims and the relief sought. These petitioners have come nowhere close.

*Wisconsin Voters Alliance v. Wisconsin Elections Commission*, No. 2020AP1930-OA, slip op., at

2-3 (Wisc. Sup. Ct. Dec. 4, 2020) (Hagedorn, J., concurring). So too here.

In the universe of meritless cases dismissed across the country over the past many weeks,

seeking such an extraordinary remedy with no legal or factual support is just table stakes. The

Campaign's unexplainable and inexcusable delay in bringing this lawsuit, however, is unmatched

by any of the other cases. The Secretary issued the Drop Box Guidance that the Campaign now

challenges on September 9, 2020. At any point after September 9, if the Campaign believed that

the Guidance was unlawful and drop boxes were not permitted under state law, the Campaign

should have brought suit quickly. It certainly should have sued well before the election, so that if

any court found its arguments had merit, the State could have changed course regarding the use of

drop boxes *before* votes had been cast in reliance on the election system and guidance in place.

In fact, the Republican Party of New Mexico (RPNM)—an organization obviously in

privity with the Trump Campaign—*did* file suit on October 27, 2020, to challenge the use of drop

boxes. *See* Complaint, *Republican Party of New Mexico v. Maggie Toulouse Oliver*, Case No: D-

101-CV-2020-02344 (N.M. First Jud. Dist. Ct.), attached as Ex. A ("RPNM Compl."). But in that

lawsuit, brought just shy of 50 days before the instant action, the RPNM sought not to *challenge*

the Secretary's Drop Box Guidance, but to *enforce* it. *Id.* ¶13 ("The RPNM, however, has generally

been game to consider drop boxes a permissible cross-breed of traditional in-person delivery of

absentee ballots . . . ."); *id.* Prayer for Relief at Paragraphs A-C (asking the Court to issue a TRO

or preliminary injunction requiring that drop-box use comply with the Secretary's previously

issued Standards & Guidance, dated September 9, 2020). The RPNM then quickly dropped its claims against the two county clerk defendants after they agreed to comply *with the Secretary's Drop Box Guidance*. Dismissal of Party (Guadalupe County), filed 10/27/2020 and Dismissal of Party (Taos County), filed 10/29/2020, attached as Exs. B & C.

If the RPNM was able to bring suit to *enforce* the Guidance a week before the election, obviously the Trump Campaign could have brought suit then (or any time before) to *challenge the constitutionality* of the Guidance as it now seeks to do. Yet the Campaign chose not to file suit then. Instead, it waited until after the election on November 3, and after the Governor's certification of the election results on November 24, only filing suit on December 14, the day Presidential Electors across the country cast and transmitted their votes to federal officials. That inexcusable delay not only hugely prejudiced the defendants (and all of New Mexico's voters), but also ensured that the Campaign's lawsuit is now entirely moot.

The Campaign perhaps deserves credit for one thing: honestly admitting that it waited, rather than file suit back when the guidance first came out, *because it wanted to see who won the election in New Mexico*. *See* Doc. 9, ¶ 76 ("Prior to the election, there was no reason to know who would win the vote in the state of New Mexico."). That sort of game-playing is precisely why the doctrine of laches not only exists, but is particularly strictly enforced in the elections context. *See Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (quoting *Purcell*, 549 U.S. 1,5–6, (2006) ("Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so.").

Courts cannot permit candidates (or their campaigns, or their surrogates or supporters) to lie in the weeds harboring concerns or disagreements about the legality of the procedures under

which an upcoming election is to be held, only to spring out with a lawsuit if the candidate ends up losing. Were that allowed, elections would never be the same—they would never be decided at the ballot box, but in courtrooms in the weeks and months afterwards. *But see Donald J. Trump for President, Inc. v. Secretary of Pennsylvania*, 830 Fed. App'x 377 (3d Cir. Nov. 27, 2020) (Bibas, J.) ("Voters, not lawyers, choose the President. Ballots, not briefs, decide elections.").

Pulling the rug out from under voters who cast their ballots in reliance on the voting rules in place at the time they voted not only implicates laches but would violate those voters' constitutional rights. Trying to do so in the manner the Trump Campaign has tried here—filing an "emergency" request for an *ex parte* TRO more than a month after the election, on the very day the Presidential Electors *must* cast their votes under federal law, *see* 3 U.S.C. § 7, and seeking in effect a preliminary injunction that decides the litigation in its entirety—is even more risible.

The Court should quickly reject this meritless request for injunction on any of a number of independently sufficient bases, including Eleventh Amendment sovereign immunity; laches; mootness; lack of standing; and a complete lack of merit. For those same reasons, the Court should grant Defendants' motion to dismiss[2]. But the Court should go further and issue an order to show cause why the Trump Campaign and its attorneys should not be sanctioned under Fed. R. Civ. P. 11 for filing one of the most egregiously meritless lawsuits, particularly given the inexcusable delay in filing, in a season of meritless litigation. Indeed, the Campaign's filing of an amended complaint seeking to cast doubt on the entire election in New Mexico based on so-called "expert" evidence relating to the use of Dominion voting machines in *Michigan*, that it does not even bother to tell this Court was rejected there and elsewhere, is simply inexcusable. The message should be

---

[2] Pursuant to D.N.M.LR-Civ 7.1, based on the nature of the Motion to Dismiss, Plaintiff stands in opposition.

clear: the election is over, the electors have cast their ballots, the challenges have been heard and rejected decisively. No more 13th-hour lawsuits should be filed. While it is commonly (and rightly) said that elections have consequences, filing frivolous litigation has consequences, too.

## BACKGROUND

### I.    Canvassing of Election and Certification of Electors

At this point, all Defendants have completed their work relating to the 2020 Presidential Election. Under state law, "[t]he county canvassing board . . . approve[d] the report of the canvass of the returns and declare[d] the results" of the election. NMSA 1978, § 1-13-13(A). The county canvassing board then "issue[d] a certificate of canvass of the results of the election." *Id.* § 1-13-13(B). The State Canvassing Board met on November 24, 2020, approved the report of the canvass and declared the results of the election of each candidate voted upon by the entire state. *Id.* § 1-13-15(A). The State Canvassing Board certified the results of the 2020 General Election by a 3-0 vote, declaring Joe Biden and Kamala Harris the winner of the presidential election contest. Ex. D. At that same meeting, the Governor approved and signed the Certificates of Ascertainment for the slate of electors for Joe Biden and Kamala Harris. Ex. E. Those certificates were transmitted to and received by the Archivist of the United States pursuant to 3 U.S.C. § 6.

On December 14, 2020, the Meeting of the Presidential Electors was held and the electors voted, certified, and transmitted their certificates to all relevant parties, including to the Archivist of the United States pursuant to 3 U.S.C. § 11. Ex. F. On January 6, 2021, the electoral votes are "opened, presented, and acted upon." 3 U.S.C. § 15. This action is ministerial in nature and not an opportunity for Congress to re-tally votes or reject Electoral College votes rightfully qualified.

## II.     The Secretary's 2020 Drop Box Guidance

On September 9, 2020, the Secretary issued the General Election 2020 Drop Box Standards & Guidance (the "Drop Box Guidance"). *See* Doc. 1, Ex. 3. That guidance explained that local election officials had the legal authority to provide drop boxes for the collection of absentee ballots at every voting location. *Id*. at p. 1. It was issued pursuant to the authority granted to the New Mexico Office of the Secretary of State ("SOS") by the New Mexico Legislature in Senate Bill 4 (2020 1st Special Session) (SB 4, attached as Ex. G), and the New Mexico Department of Health's Public Health Order on Polling Location ("PHO") (PHO, attached as Exhibit H). *Id*. The Drop Box Guidance is also consistent with numerous provisions of the Election Code. *See* SB 4 at 5. SB 4 sunset on December 31, 2020.

## III.    The Republican Party of New Mexico's Lawsuit To Enforce Drop Box Guidance

On October 27, 2020, the RPNM filed suit against the Secretary and the county clerks of Taos and Guadalupe counties. *See* RPNM Complaint. The RPNM sought a TRO and permanent injunction to require the county clerks "to either immediately discontinue the use of drop boxes or ensure that they are made inaccessible to the public during non-polling hours and kept continuously, directly monitored by at least two bipartisan election officials during polling hours, in keeping with the Secretary's Standards & Guidance." *Id.* at 9. Of course, "the Secretary's Standards & Guidance" that the RPNM sought to *enforce* through the October 27 lawsuit is precisely the same Drop Box Guidance that the Trump Campaign now asks this Court to *declare illegal*, and even *unconstitutional*.

Given the close relationship between the Trump Campaign and the RPNM, perhaps they should have gotten their strategy straight back in October. Instead, the RPNM dropped both county

clerks from the lawsuit, having apparently satisfied itself that both clerks were in fact following the Secretary's Drop Box Guidance, and the court then dismissed the lawsuit. See Order of Dismissal, attached as Ex. I. The dismissal was without prejudice, however, meaning the RPNM was permitted to re-file if it wished to pursue further alleged problems. The RPNM did not.

## ARGUMENT

### I.      Motion to Dismiss Under 12(b)(1) and 12(b)(6)

"A 12(b)(1) motion is the proper avenue to challenge the court's subject matter jurisdiction, and Rule 12(h)(3) requires that '(w)henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.'" *Barnson v. United States*, 531 F. Supp. 614, 617 (D. Utah 1982). A 12(b)(6) motion assesses "whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

### II.      Preliminary Injunction Factors[3]

A preliminary injunction is an extraordinary remedy that should only be granted if the movant carries the burden of showing a right to relief that is clear and unequivocal. *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016). To obtain a preliminary injunction, the moving party must demonstrate four elements: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208

---

[3] The Court has already rejected the Trump Campaign's request for an *ex parte* temporary restraining order. Doc. 3; Doc. 17.

(10th Cir. 2009). The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

Preliminary injunctions are particularly disfavored if they: (1) alter the status quo; (2) are mandatory preliminary injunctions; and/or (3) afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *RoDa Drilling Co*, 552 F.3d at 1208. A party seeking a disfavored injunction must demonstrate a substantial likelihood of success on the merits and make a strong showing that the balance of harms tips in the movant's favor and the preliminary injunction is not adverse to the public interest. *Id.* at 980.

All three circumstances characterizing particularly disfavored injunctions are implicated by the Trump Campaign's Motion. *First*, the Campaign seeks to disrupt the status quo that existed when the dispute arose. The presidential election is over, the Defendants have all completed their responsibilities for that election, and most importantly the presidential electors have already voted and transmitted their votes to the Archivist of the United States. The Campaign requests an injunction to delay or stay this vote, which is now impossible, or to unconstitutionally vacate certification of New Mexico's presidential electors, altering the status quo. *Second*, the requested injunction is also mandatory, as it requires the Secretary to recanvass the election and investigate the use of drop boxes and Dominion voting machines in the 2020 General Election. *Finally*, the requested injunction would fully decide the merits of the dispute by decertifying the election results. For all these reasons, the Campaign must meet the extraordinary burden of establishing by clear and unequivocal evidence that they satisfy all four elements necessary for a preliminary injunction. Given the disfavored nature of the injunction they seek, any doubts (and there should be none) must resolve in Defendants' favor. Because the Campaign cannot make a "clear and

unequivocal" showing on *each* of the four elements necessary for preliminary injunction, its motion must be denied. *See Wilderness Workshop v. BLM*, 531 F.3d 1220, 1224 (10th Cir. 2008).

### III. The Trump Campaign Has Zero Likelihood of Success On the Merits, As This Lawsuit Should Be Dismissed On the Pleadings

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (internal quotation marks omitted). For numerous reasons, each of which is independently sufficient to doom this lawsuit, the Trump Campaign's claims cannot survive the pleading stage, under either Rule 12(b)(1) or 12(b)(6). By definition, then, the Campaign's claims are not likely to succeed on the merits.

#### A. The Trump Campaign's Claims Are Barred By The Eleventh Amendment

As an initial matter, all of the Trump Campaign's claims are barred by the Eleventh Amendment. The Eleventh Amendment prohibits federal courts from entertaining suits against states brought by their own citizens or citizens of another state without their consent. *See Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990). It also extends to suits against state agencies or departments, *see Pennhurst State Sch. & Hosp v. Halderman*, 465 U.S. 89, 100 (1984), and "suits against state officials when 'the state is the real, substantial party in interest.'" *Id*. at 101 (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)). A suit against a state, a state agency or department, or a state official is in fact a suit against the state and is barred "regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp.*, 465 U.S. at 100-02.

Exceptions to a state's Eleventh Amendment immunity are few. A state may, however, voluntarily waive its immunity. *See Edelman v. Jordan*, 415 U.S. 651, 673 (1974). Congress may

also abrogate Eleventh Amendment immunity pursuant to Section 5 of the Fourteenth Amendment to the Constitution of the United States, so long as the statute purportedly abrogating immunity explicitly manifests Congress' intent to do so. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Congress did not, however, abrogate Eleventh Amendment immunity when enacting 42 U.S.C. § 1983. *See Quern v. Jordan*, 440 U.S. 332, 340 (1979). Claims against a state pursuant to § 1983 in the federal courts are thus barred as a matter of law.

Although not properly characterized as an exception to a state's Eleventh Amendment immunity, the doctrine that the Supreme Court announced in *Ex parte Young*, 209 U.S. 123 (1908), allows for suits against state officials if specific requirements are met: (i) the plaintiffs are suing state officials rather the state itself; (ii) the plaintiffs have alleged a non-frivolous violation of federal law; (iii) the plaintiffs seek prospective equitable relief rather than retroactive monetary relief from the state treasury; and (iv) the suit does not implicate special sovereignty interests. *See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior*, 160 F.3d 602, 609 (10th Cir. 1998). '"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a Court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)). *Ex parte Young* does not apply, though, to *state law* claims against state officials, no matter the relief sought. *Pennhurst State Sch. & Hosp.*, 465 U.S. at 106.

The Trump Campaign purports to make a federal claim under the Electors Clause, but the crux of that claim concerns alleged violations of *state* law (namely, that the Drop Box Guidance

violated New Mexico election law). The Campaign should not be permitted to evade the strict rule of *Pennhurst* by trying to dress up what are indisputably state-law claims in federal-law garb.

Yet even if the Trump Campaign were permitted to evade the Eleventh Amendment in that way, the *Ex parte Young* rule would still not apply here because the Campaign is not seeking prospective relief to end a continuing violation of federal law. Instead, the Campaign seeks to undo events that have already occurred:  to "vacate the Defendant Electors' certifications" and "remand to the state of New Mexico Legislature pursuant to 3 U.S.C. § 2 to appoint electors." The main request—vacating the Electors' certifications—is retrospective relief that falls squarely outside the reach of *Ex parte Young*, and so is prohibited by the Eleventh Amendment. The additional request—that the Court "remand" the case "to the state of New Mexico legislature"—is utterly nonsensical. Yet even on its own terms, it also does not fall within the *Ex parte Young* exception, as it in no way seeks to end some ongoing illegal conduct. The request rather seeks to have the Court require the Legislature to take an affirmative action (appoint its own slate of electors), which falls well outside of *Ex parte Young* and is flatly prohibited by the Eleventh Amendment.

Finally, the request that the Court order the Secretary to conduct an "emergency confiscation and preservation of all Dominion voting machines and software owned or operated by government agencies in the state of New Mexico," and submit those machines to a third-party forensic examination, also plainly contravenes the Eleventh Amendment. In truth, the Dominion portions of the amended complaint make no sense as an independent legal claim—they state no discernable legal claim of any sort. In any event, the Dominion request for relief does not seek to end some alleged ongoing illegal conduct, and has no connection to federal law. It thus fails to meet the *Ex parte Young* exception, and accordingly violates the Eleventh Amendment.

### B.     The Trump Campaign's Claims Are Barred By Laches

Laches is rooted in the principle that "equity aids the vigilant and not those who slumber on their rights." *Kansas v. Colorado*, 514 U.S. 673, 687 (1995) (internal quotation marks omitted). The doctrine "bars a party's dilatory claim ... when there is: '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1090-91 (10th Cir. 2014) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002)). Courts apply laches particularly strictly in election cases, in recognition of the fundamental importance of the right to vote and the reliance interests of innocent voters whose votes could be discarded if litigants wait to challenge voting procedures until close to, or after, an election is held. *See Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020); *King v. Whitmer*, No. 20-CV-13134, 2020 WL 7134198, at *6-8 (E.D. Mich. Dec. 7, 2020) (Dec. 7, 2020).

Laches clearly applies here. The Trump Campaign showed no diligence in raising its claims. It filed this action on December 14—more than 41 days after the November 3 general election, and on the very day the New Mexico Presidential Electors voted and transmitted their votes to the Archivist of the United States. Even worse, this suite was not served on the Secretary until December 16, 2020.[4] If the Campaign had legitimate claims regarding the constitutionality of the Secretary's Drop Box Guidance, it could and should have brought its claims well in advance of Election Day—certainly not six weeks after.

---

[4] It should also be noted that the Campaign seeks to enjoin the state of New Mexico from acting, and as such, the state of New Mexico should be a party to this lawsuit.  Doc. 9 at ¶4). To date, the New Mexico Governor's Office has not been served, which is required under Fed. R. Civ. P 4(j)(2) or Rule 1-004(H)(1)(a) NMRA when the state of New Mexico is a Defendant.

More specifically, the Secretary issued the Drop Box Guidance publicly on September 9. Diligence required anyone who wished to challenge that guidance to bring such a challenge quickly, before county election officials and voters began to rely on the guidance in conducting, and voting in, the election.

The Trump Campaign may argue that it did not learn of alleged "irregularities" in the use of drop boxes until October 6, 2020. *See* Doc. 9 at ¶30. Yet even if that were the relevant date for laches purposes, the Campaign still delayed more than two months to file suit. Again, the delay is inexcusable, as it resulted in innocent parties—election administrators and voters—relying on the procedures in place to conduct and vote in the election. Laches does not permit a candidate for office to lie in wait for weeks, see how the election turns out, and then try to overturn the results after losing based on alleged problems known weeks, even months before Election Day.

In fact, the Secretary was in contact with representatives of the Trump Campaign regarding the use of drop boxes throughout New Mexico starting in the beginning of October. And RPNM believed its alleged concerns regarding the implementation of drop boxes—ironically, that the Secretary's Guidance was allegedly *not* being properly followed—were ripe enough to bring in state court a week before the election. The Campaign still chose to do nothing until now. That constitutes an inexcusable lack of diligence.

The Trump Campaign offers no persuasive explanation for why it waited so long to file suit, except to admit that, "[p]rior to the election, there was no reason to know who would win the vote in the state of New Mexico." Doc. 9 at ¶ 76. This statement lays bare the real motivation of this sore loser lawsuit. If President Trump had won New Mexico, apparently his Campaign would

not have cared that, in its view, federal law was violated. That explanation is proof of gamesmanship, not diligence.

The Trump Campaign's inexcusable delay is even more egregious with regard to its decision to file an amended complaint on December 22, 2020, raising baseless allegations regarding Dominion voting machines that had been previously raised, and universally rejected, in courts across this country. The Trump Campaign does not even attempt to explain its delay in raising these issues.

The prejudice that would be inherent in letting the Trump Campaign's exceptionally late lawsuit go forward is undeniable. Elections must have finality. Failing to apply laches to lawsuits brought weeks after an election to challenge pre-election procedures would "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Hendon v. N.C. State Bd. Of Elections*, 710 F.2d 177, 182 (4th Cir. 1983).

It is well-established that eleventh-hour requests for injunctions are disfavored. "As a general rule, last-minute injunctions changing election procedures are *strongly disfavored*." *Serv. Employees Int'l Union Local 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012) (emphasis added) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *Ne. Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1012 (6th Cir. 2006); *Summit Cty. Democratic Central and Exec. Cmte. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004)); *see also William v. Rhodes*, 393 U.S. 23, 34-35 (1968).

What we have here, though, is not even an eleventh-hour request for an injunction, but a *thirteenth*-hour request—a request that would invalidate the votes of nearly a million New Mexico voters who cast their ballots relying on the rules and guidance in place when they did so. Federal

courts consistently refuse to nullify votes cast in reliance on guidance and policies in effect when those votes were cast. *See, e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1074-75 (1st Cir. 1978); *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012). The prejudice inherent in invalidating votes in those circumstances is so extreme as to impinge on the voters' constitutional due process rights, as the courts recognize.

In fact, the Supreme Court recently reaffirmed the principle that votes already cast in reliance on existing procedures should not be invalidated, even if the procedures are later found unlawful. In *Andino v. Middleton*, No. 20A55, 2020 WL 5887393 (U.S. Oct. 5, 2020), the Supreme Court stayed a district court's order that had briefly enjoined a state-law witness requirement for absentee ballots. *See id.* But the Supreme Court also expressly held that any votes cast while the district court's order had been in effect "may not be rejected for failing to comply with the witness requirement." *Id.* That ruling illustrates the critical importance of validating voters' reliance on the rules in place at the time they vote. To do otherwise—to invalidate votes cast in reliance on the rules and procedures in place when they voted—would be prejudicial in the extreme.

The Defendants, like New Mexico's voters, have been severely prejudiced by the Trump Campaign's unjustified, and indeed tactical, delay. The Campaign seeks to reverse the course of history by having this Court grant the extraordinary remedy of decertifying the election results lawfully and timely certified by the State Canvassing Board. In the words of the 7th Circuit in recently affirming the dismissal of the Trump Campaign's Wisconsin complaint on laches grounds, "The President had a full opportunity before the election to press the very challenges to Wisconsin law underlying his present claims. Having foregone that opportunity, he cannot now—after the

election results have been certified as final—seek to bring those challenges." *Trump v. Wisconsin Elections Commission*, Case 20-3414, slip op. at 8 (7th Cir. Dec. 24, 2020). So too in New Mexico.

### C.      The Trump Campaign's Post-Certification Claims are Moot.

As explained above, the time has passed to provide the relief sought by the Trump Campaign. In general, a Federal Court has a continuing duty to ensure that it adjudicates only genuine disputes between adverse parties, where the relief requested would have a real impact on the legal interests of those parties. *See Church of Scientology v. United States*, 506 U.S. 9, 12 (1992); *McPherson v. Mich. High School Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc). If "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome," then the case is moot and the court has no jurisdiction. *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979). A "live" controversy is one that "persists in 'definite and concrete' form even after intervening events have made some change in the parties' circumstances." *DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974)); *Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006).

Among other things, the Trump Campaign asks the Court to "order a temporary restraining order to the Defendant Secretary and the Defendant Electors of the state of New Mexico to delay disposition of certificates of votes for President and Vice President." Doc. 9, Prayer for Relief B. Yet as stated above, the voting, certification and transmittal of certificates under 3 U.S.C §§ 8-11 was completed on December 14. This requested relief is thus wholly moot, overtaken by events as a result of the Campaign's extraordinary delay in filing suit.

The same is true of the bizarre list of demands made in paragraphs A, C, D, and E of the Campaign's Prayer for Relief in its Amended Complaint, seeking to force some sort of inspection of various aspects of the completed election. All of these demands are now moot, because the end

result sought by the Campaign—that the Legislature somehow appoint a different slate of Presidential Electors as a result of the requested inspection—can no longer be accomplished and is itself moot. Under federal law, all Electors had to meet, cast their votes, and transmit those votes to the relevant federal officials on December 14. *See* 3 U.S.C. § 7. That day has come and gone. There is no way under federal law to now nominate a wholly new slate, so the lawsuit is moot.

### D.     The Trump Campaign Lacks Standing

Standing requires a plaintiff to establish that (1) he has suffered an injury in fact that is "concrete and particularized and actual or imminent"; (2) the injury is "fairly… trace[able] to the challenged action of the defendant"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992) (internal quotation marks omitted).

Even a party that meets Article III standing requirements must ordinarily rest its claim for relief on violation of its own rights, not those of a third party. *Pitt News v. Fisher*, 215 F.3d 354, 361–62 (3d Cir. 2000). A plaintiff may assert the rights of another if he or she "has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004).

The only real claim for relief advanced by the Campaign in this lawsuit is its Electors Clause claim: that the Secretary's Drop Box Guidance violated New Mexico law, and so usurped the power of the Legislature under the Electors Clause, U.S. Const. art. II, § 1, cl. 2. (In the amended complaint, the Campaign now also alleges that New Mexico's use of Dominion voting machines violates "all reasonable standards of electoral integrity"—whatever that means. Doc. 9

at ¶112. These types of claims, alleging generalized failure to comply with the law, are "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance in the past." *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

Moreover, even if the Campaign gained all the relief requested, it would not redress the alleged harm. At most, granting the requested relief would throw the election back into the Legislature's hands, with the Legislature free to act as it chooses. Without redressability, there is no standing.

The Trump Campaign's claims likewise fail under prudential standing doctrine. The Campaign asserts that the Secretary's guidance usurped the Legislature's prerogative under the Electors Clause to prescribe the "manner" for choosing presidential electors, but the Electors Clause grants that right to "the Legislature" of "each State." U.S. Const., art. II, § 1, cl. 2. The Campaign's Electors Clause claim belongs, if to anyone, only to the Legislature—which has chosen *not* to litigate any such claim. The Campaign thus lacks standing to sue over the alleged usurpation of the Legislature's rights under the Electors Clause, and the Campaign does not even manage to articulate what right was supposedly violated by the use of Dominion voting machines.

### E.      The Trump Campaign's Claims Are Without Merit

#### 1.      *The Campaign's Electors Clause Claim, Seeking to Void the Election Results and "Remand" to the State Legislature, Is Nonsensical*

Since the defendant Presidential Electors have already cast their votes for President and Vice President and transmitted those votes to the relevant federal officials, the only relief even arguably remaining available to the Trump Campaign is the request that the Court "vacate the Defendant Electors' certifications" and "remand to the state of New Mexico legislature pursuant to 3 U.S.C. § 2 to appoint electors." The Campaign identifies no power, no precedent, under which

this Court could "vacate" those certifications. But even more fundamentally, the concept of "remanding" a case from an Article III court to a state legislature is without any basis in law.

Such a concept is found nowhere in the U.S. Code or reported federal court decisions, and is not remotely consistent with the structure and purpose of the Article III judiciary. Our federal judiciary consists of courts of limited jurisdiction constitutionally permitted to decide cases and controversies—not to submit cases for final decision to a state legislative body. Courts around the country have found that they do not have the power to "remand" a case to a state legislature. The Eastern District of Michigan, for instance, earlier this month rejected such a request, stating "'there is no basis in law by which the courts may grant [Plaintiffs'] request to ignore the results of an election and recommit the choice to the General Assembly to substitute its preferred slate of electors….'" *King v. Whitmer*, No. 20-CV-13134, 2020 WL 7134198, at *6 (E.D. Mich. Dec. 7, 2020) (quoting *Kelly v. Commonwealth*, No. 68 MAP 2020, 2020 WL 7018314, at *3 (Pa. Nov. 28, 2020) (Wecht,, J., concurring)). A Georgia federal court also recently held that "interfere[ing] with the result of an election that has already concluded would be unprecedented and harm the public in countless ways." *Wood v. Raffensperger*, No. 1:20-cv-04651, 2020WL 6817513, at *13 (N.D. Ga. Nov. 20, 2020), aff'd, 2020 WL 7094866 (11th Cir. Dec. 5, 2020). In essence, the Campaign's request is unheard of and is certainly not a proper remedy for a federal court to order.

Yet even if such a procedure were possible, the Campaign has provided no basis for it here. The Campaign offers a novel legal theory, referred to as the "independent state legislature doctrine," to purportedly justify decertifying the election results in New Mexico. This legal theory has never been adopted by a majority of the Supreme Court, and in any event it could never possibly apply here.

The Campaign contends that because the Constitution delegates authority to state legislatures to determine the "Manner" of appointing presidential electors, U.S. Const. art. II, § 1, cl.2, the federal courts have a role in protecting this state legislative authority. Yet even if such a theory could be valid, it could only possibly apply where a state official's interpretation of applicable statutes has "significantly depart[ed]" from the text of those statutes. *See, e.g.*, *Democratic Nat'l Comm. v. Wisc. State Leg.*, No. 20A66, 2020 WL 6275871, at \*6 n.1 (U.S. Oct. 26, 2020) (Kavanaugh, J., concurring) (mem.) ("In a Presidential election . . . a state court's '*significant departure* from the legislative scheme for appointing Presidential electors presents a federal constitutional question.'" (quoting *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C. J., concurring)) (emphasis added)).

The 7th Circuit recently rejected the Trump Campaign's similar Electors Clause argument in Wisconsin, holding that alleged deviations from Wisconsin law by elections officials did not give rise to a claim under the Electors Clause. It first stated that "[w]e are not the ultimate authority on Wisconsin law. That responsibility rests with the State's Supreme Court. Put another way, the errors that the President alleges occurred in the Commission's exercise of its authority are in the main matters of state law. They belong, then, in the state courts, where the President had an opportunity to raise his concerns." *Trump v. Wisconsin Elections Commission*, Case No. 20-3414, slip op. at 11. It then affirmed that "even on a broad reading of the Electors Clause, Wisconsin lawfully appointed its electors in the manner directed by the Legislature" *Id.*

As in Wisconsin, the Secretary's interpretation of state law to implement drop boxes was based on express legislative authority, so this is not a case that calls for a federal court "to ensure that state courts do not rewrite state election law" under the independent state legislature doctrine.

*Id.* This being said, this Court should be especially reluctant to step in here under the independent state legislature doctrine, given the enormous procedural deficiencies of Plaintiff's untimely post-certification lawsuit.

> 2. *The Campaign's allegations that the Secretary's Drop Box Guidance violates state law are meritless*

The Drop Box Guidance the Campaign challenges as purportedly illegal under state law was guidance the Secretary issued lawfully, pursuant to the Legislature's grant of authority to implement changes in the conduct of the 2020 general election for the preservation of the health and safety of county clerks and their staffs, election board members and voters. NMSA 1978, § 1-12-72(O). As a matter of state law, then, the Trump Campaign's claims regarding the Drop Box Guidance are meritless.

This past summer, the New Mexico Legislature passed SB 4, which enacted a new section of the Election Code including provisions related to conducting the general election on November 3, 2020, under a continuing COVID-19 pandemic. Pursuant to SB 4, the New Mexico Secretary of Health could issue PHOs relating to the general election, specifying areas of the state where the order applies and the severity of the public health issues, and also make recommendations to mitigate health issues. § 1-12-72(O). Section 1-12-72(O) goes on to state:

> If the secretary of health issues a public health order regarding the conduct of the 2020 general election on or before the sixtieth day before the 2020 general election, the secretary of state *shall*, in consultation with each county clerk in an area identified in the public health order, *implement changes in the conduct of the 2020 general election* only to the extent necessary for the preservation of the health and safety of county clerks and their staffs, election board members and voters.
> (Emphasis added).

Sixty days before the general election was September 4, 2020. On September 3, 2020 the Secretary of Health issued its PHO on social distancing restrictions in polling locations. Ex. H.

The PHO stated that "Due to the continued spread of COVID-19 throughout the state, it is necessary that all election administrators continue taking actions to minimize transmission of COVID-19 and to reduce its attendant physical and economic harms."

The PHO goes on to state that "Pursuant to…Section 1-12-72(O)…this Order permits those election-related facilities to operate subject to certain requirements designed to mitigate the risk of spreading COVID-19 through in-person voting. Such requirements shall apply to every county due to the widespread nature of the current pandemic and the possibility of new outbreaks at any time across the state." Finally, and most importantly, the PHO states "The Secretary of State *shall implement* the social distancing protocols contained in this Order and may provide additional guidance to facilitate and ensure compliance with such *protocols to limit the amount of voters in a polling location at one time*." (Emphasis added) (Ex. H pg. 2).

It is with this explicit authority granted to it by the Legislature and Department of Health that the SOS issued its Drop Box Guidance. As a matter of law, then, the Drop Box Guidance was legal, and the Campaign's claims to the contrary have no merit.

Moreover, the use of drop boxes by county clerks was also consistent with the rest of the Election Code. Using drop boxes in the manner permitted by the Secretary's Guidance comports, for instance, with New Mexico law permitting a mailed ballot to "be returned in person to any voting location," *see* NMSA 1978, § 1-6- 9(D), since the drop boxes were all located at "voting locations." *See also* NMSA 1978, § 1- 12-8.2 (a voter shall be allowed to deliver a mailed ballot on Election Day to any polling location in the county).

In sum, it is clear that the Secretary was expressly granted authority by the Legislature to issue her Drop Box Guidance, and also that the use of drop boxes pursuant to that Guidance was

independently consistent with New Mexico law. The Campaign has thus failed to state a claim under Rule 12(b)(6), and certainly failed to meet the heightened burden of demonstrating likelihood of success on the merits, as required for purposes of injunctive relief.

### 3. *The Campaign has failed to plead plausible allegations of widespread failure to comply with the election code by election administrators.*

Plaintiff *believes* that county clerks engaged in systemic or intentional failure to comply with election laws. Doc. 9 at ¶ 26. Yet even putting aside the propriety of the Secretary's Guidance as a matter of law, Plaintiff has failed to plead facts sufficient to prove that even if the Guidance had been unlawful, the use of purportedly illegally maintained drop boxes impacted the outcome of the election. Without making such a showing, the Campaign has not demonstrated a plausible right to relief, and that requires dismissal (and certainly denial of the requested injunction).

In fact, the RPNM's lawsuit against the Guadalupe County Clerk and the Taos County Clerk proves the opposite. These were the only county clerk offices anywhere in the state whose election conduct the RPNM complained about to state election officials during the actual election. On October 27, the RPNM dismissed Guadalupe County Clerk from the lawsuit and on October 29, RPNM dismissed Taos County Clerk from the lawsuit. This shows RPNM's own belief that the county clerks were sufficiently compliant with their use of drop boxes as of late October, and any alleged improper compliance with the drop box guidance by these two small counties did not implicate violations of federal law.

### 4. *The recently added Dominion claims are at best frivolous.*

The Trump Campaign's Dominion allegations are shockingly frivolous.  *First*, they do not relate to the state of New Mexico. Rather, the Campaign amended its "emergency" complaint in order to attach a so-called expert report describing purported fabrication of votes counted in

*Michigan* as a basis for casting doubt on votes counted in *New Mexico*. Doc. 9, 9-1. The amended complaint averred that because the Dominion equipment and software was allegedly inaccurate in Michigan, "inaccuracies presumably existed in New Mexico as well." Doc. 9 at ¶¶12-13. This type of pleading is improper under any pleading requirement. Perhaps not surprisingly given this cut and paste job, the amended complaint likewise fails to allege that a single vote was cast or counted in New Mexico using a Dominion voting machine, alleging only that "The Secretary of State has approved the use of voting equipment and software sold by [Dominion] . . . throughout New Mexico." *Id.* at ¶12. Nor does it allege that a single vote that was cast or counted using a Dominion machine in New Mexico resulted in an improper vote being credited to Biden, versus Trump.

*Second*, the Trump Campaign misrepresents that the "Dominion equipment and software has been found to be inaccurate in many states." *Id.* at ¶12. This is false. In fact, the so-called expert report of Russell James Ramsland, Jr. that the Campaign goes on to describe in, and attach to, its amended complaint as the basis for the "presumed" irregularities in New Mexico was presented to, and rejected by, a Michigan federal court in *King v. Whitmer*. There, the court found:

> Plaintiffs are far from likely to succeed in this matter.  In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic process and their trust in our government.  Plaintiffs ask this Court to ignore the orderly statutory scheme established to challenge elections and to ignore the will of millions of voters. This, the Court cannot, and will not, do.

*King v. Whitmer*, No. CV 20-13134, 2020 WL 7134198, at *13 (E.D. Mich. Dec. 7, 2020).  In Arizona, where another court was tasked with considering a different Ramsland report, the court again rejected his far-fetched theories, finding that the so-called spike in results was "not only compatible with, but indeed was more likely explained by, lawful, unchoreographed reporting of

early ballot tabulation in those counties." *Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 WL 7238261, at *14 (D. Ariz. Dec. 9, 2020) (internal quotation/citation omitted).

*Third*, even if the Court could somehow excuse the above failings, the new allegations in the first amended complaint fail to state any claim. Rather, all that is alleged is that the Dominion voting machines violate "all reasonable standards of electoral integrity." Litigants are not permitted to make broad (and wholly unsubstantiated) claims of alleged wrongdoing, and leave it to a court to sort out what laws were allegedly broken. Having pasted in some allegations from another lawsuit in another state, and failed to bother to explain either how those allegations have any connection to New Mexico, or what laws (state or federal) those allegations implicate, the Campaign has utterly failed to state any sort of cognizable claim here with respect to the new Dominion allegations, which should be dismissed outright.

### F. The Trump Campaign Fails to Make A Clear Showing That Irreparable Harm is Likely Absent an Injunction

To establish irreparable harm, the Trump Campaign must present specific, concrete evidence that they likely will be harmed absent a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22, 129 S. Ct. 365, 376 (2008).

The Trump Campaign's claims of harm are entirely speculative. Their allegations are vague and fail to demonstrate that any law was actually violated, or that any violation affected any particular voter. In addition, the ultimate prospective relief the Campaign seeks—to "remand" this case to the State Legislature, for that body to vote on a new slate of electors—leaves the ultimate outcome of this dispute wholly in the discretion of the Legislature. Put another way, even if this Court were to grant all the relief requested, including ordering various confiscations and investigations, running all the way to the "remand," none of that would necessarily result in the

Campaign receiving the relief it ultimately wants, which is to have the Legislature declare Donald Trump the winner of New Mexico's electoral votes. (In fact, such a result is virtually unthinkable, given that the Legislature—the only party who could possibly have standing to assert an Electors Clause claim—has chosen not to pursue any such claim, or to pursue in any way the overturning of the election results in New Mexico.) The Campaign cannot possibly allege, let alone prove, the likelihood of "imminent injury" and "irreparable harm" from the denial of the relief it seeks, when the granting of that relief will not redress the "injury" or "harm" it purports to be seeking to avoid.

### G. The Requested Relief Irreparably Harms the State's Regulatory Interests and Is Against the Public Interest.

Here, the balance of harms and public interest factors weigh in Defendant's favor. These factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. It is undisputed that the State has a compelling interest in preserving the integrity of its election process while ensuring the health, safety, and welfare of voters and election administrators in the midst of the COVID-19 pandemic. If the requested injunction were granted, it would irrevocably break the statutory process for election certification and disenfranchise all New Mexico voters in favor of a candidate who is disappointed with the election results.

As an Arizona federal court recently ruled in rejecting a similar request from the proposed Trump electors in Arizona, "granting Plaintiffs the injunctive relief they seek would greatly harm the public interest. . . . [T]he requested relief would cause enormous harm to Arizonans, supplanting the will of nearly 3.4 million voters reflected in the certified election results and potentially imperiling Arizona's participation in the Electoral College. It would be more difficult to envision a case in which the balance of hardships would tip more strongly against a plaintiff." *Bowyer v. Ducey*, 2020 WL 7238261, at *15 (internal quotations omitted). The same is true here.

Even if the Court granted all the relief sought, and the Legislature selected the same Biden slate the State's voters selected, the chaos of such a process would cause irreparable harm to voters' confidence in the electoral process. Such a result would be a huge blow against the public interest.

## **CONCLUSION**

For all these reasons, Defendants respectfully request that the Court deny the motion for temporary restraining order and grant Defendants' motion to dismiss, together with any other relief the Court determines to be appropriate under the circumstances

Dated: January 5, 2021

Respectfully submitted,

HECTOR BALDERAS
New Mexico Attorney General

By: */s/ Tania Maestas*
Tania Maestas
Chief Deputy Attorney General
Office of the NM Attorney General
P.O. Drawer 1508
Santa Fe, NM 87504

Dylan Kenneth Lange
General Counsel
Office of the Secretary of State
325 Don Gaspar, Suite 300
Santa Fe, New Mexico 87501

*Attorneys for Office of the New
Mexico Secretary of State and State
Canvassing Board*