**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

DONALD J. TRUMP FOR PRESIDENT, INC.,

Plaintiff,

v.

MAGGIE TOULOUSE OLIVER, in her official capacity as Secretary of State of New Mexico, the ELECTORS of NEW MEXICO and the STATE CANVASSING BOARD OF NEW MEXICO,

Defendants

v.

DNC SERVICES CORPORATION/ DEMOCRATIC NATIONAL COMMITTEE

Intervenor Defendant.

Case No. 1:20-cv-01289-MV

**INTERVENOR-DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

I. INTRODUCTION ....... 1

II. BACKGROUND ....... 3

A. The Secretary of State issued guidance in September regarding the use of secure drop boxes to reduce the risk of COVID-19 transmission at polling places. ....... 3

B. In October, the New Mexico Republican Party filed a lawsuit challenging the guidance. ....... 5

C. President-elect Biden and Vice President-elect Harris won the popular vote in New Mexico by nearly 11 percentage points in the November general election. ....... 6

D. The Campaign waited to file this lawsuit until December 14, the day the Electoral College met. ....... 7

III. LEGAL ARGUMENT ....... 8

A. The Campaign's claim is moot. ....... 8

B. The Campaign's claims are barred by laches. ....... 11

C. The Campaign lacks standing because it asserts only generalized grievances rather than a cognizable injury. ....... 13

D. The Court does not have jurisdiction over this lawsuit. ....... 18

1. New Mexico election contests must be brought in state district court. ....... 18

2. The Court should abstain under the *Pullman* abstention doctrine. ....... 21

E. Plaintiff has failed to state a claim upon which relief can be granted. ....... 23

1. Plaintiff has failed to plead a claim under the Electors Clause. ....... 23

2. The Campaign is not entitled to the relief it seeks. ....... 24

IV. CONCLUSION ....... 26

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) (Roberts, C.J., dissenting) ....... 15, 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....... 23

*Bd. of Cnty. Comm'rs of Sweetwater Cnty. v. Geringer*,
297 F.3d 1108 (10th Cir. 2002) ....... 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....... 23

*Bognet v. Sec'y Commonwealth of Pa.*,
980 F.3d 336 (3d Cir. 2020) ....... 14, 15

*Bowyer v. Ducey*,
-- F. Supp. 3d --, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020) ....... 2

*Bush v. Palm Beach County Canvassing Board*,
531 U.S. 70 (2000) (per curiam) ....... 16

*Caldara v. City of Boulder*,
955 F.3d 1175 (10th Cir. 2020), *cert. denied sub nom. Caldara v. Boulder, Co.*, No. 20-416, 2020 WL 6701118 (U.S. Nov. 16, 2020) ....... 21, 22, 23

*Chihuahuan Grasslands All. v. Kempthorne*,
545 F.3d 884 (10th Cir. 2008) ....... 10

*Corman v. Torres*,
287 F. Supp. 3d 558 (M.D. Pa. 2018), *appeal dismissed sub nom. Corman v. Sec'y Commonwealth of Pa.*, 751 F. App'x 157 (3d Cir. 2018) ....... 18, 23

*Curry v. Baker*,
802 F.2d 1302 (11th Cir. 1986) ....... 20

*Curtis v. Oliver*,
No. CIV 20-07482020 WL 4734980 (D.N.M. Aug. 14, 2020) ....... 19

*Detroit Unity Fund v. Whitmer*,
819 F. App'x 421 (6th Cir. 2020) ....... 11

*Dinwiddie v. Bd. of Cnty. Comm'rs of Lea Cnty.*,
1985-NMSC-099, 103 N.M. 442, 708 P.2d 1043 ....... 19, 21

**TABLE OF AUTHORITIES**

**Page(s)**

*Disability Law Ctr. v. Millcreek Health Ctr.*,
428 F.3d 992 (10th Cir. 2005) .......... 8

*Donald J. Trump for President, Inc. v. Boockvar*,
-- F. Supp. 3d --, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020) .......... 2, 26

*Donald J. Trump for President, Inc. v. Sec'y of Pa.*,
830 Fed. App'x 377 (3d Cir. Nov. 27, 2020) .......... 2

*Feehan v. Wis. Elections Comm'n*,
No. 20-CV-1771-PP, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020) .......... 9, 25

*Fulani v. Hogsett*,
917 F.2d 1028 (7th Cir. 1990) .......... 13

*Glaser v. LeBus*,
2012-NMCA-028, 274 P.3d 114 .......... 19

*Habecker v. Town of Estes Park*,
518 F.3d 1217 (10th Cir. 2008) .......... 9

*Hill v. Warsewa*,
947 F.3d 1305 (10th Cir. 2020) .......... 18

*Kadonsky v. United States*,
3 F. App'x 898 (10th Cir. 2001) .......... 11

*Kelly v. Pennsylvania*,
No. 68 MAP 2020, 2020 WL 7018314 (Pa. Nov. 28, 2020), *petition for cert. docketed*, No. 20-810 (U.S. Dec. 15, 2020) .......... 12, 25

*Kiehne v. Atwood*,
604 P.2d 123 (N.M. 1979) .......... 26

*King v. Whitmer*,
-- F. Supp. 3d --, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020) .......... 2, 13

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) .......... 13, 18

*Lance v. Coffman*,
549 U.S. 437 (2007) .......... 14

*Logan v. Pub. Emps. Ret. Ass'n*,
163 F. Supp. 3d 1007 (D.N.M. 2016) .......... 19, 20

**TABLE OF AUTHORITIES**

**Page(s)**

*Martel v. Condos*,
No. 5:20-cv-131, 2020 WL 5755289 (D. Vt. Sept. 16, 2020) ... 15

*McMichael v. Napa Cnty.*,
709 F.2d 1268 (9th Cir. 1983) (Kennedy, J., concurring) ... 25

*Perry v. Judd*,
471 F. App'x 219 (4th Cir. 2012) ... 11

*Pirard v. City of Albuquerque*,
No. 1:15-CV-00707MCA-WPL, 2016 WL 10720981 (D.N.M. Feb. 10, 2016) ... 15

*Rios v. Blackwell*,
433 433 F. Supp. 2d 848 (N.D. Ohio 2006) ... 17

*RPNM v. Oliver*,
No. D-101-cv-2020-02344 ... 2, 4, 5, 22

*Sac & Fox Nation of Mo. v. Pierce*,
213 F.3d 566 (10th Cir. 2000) ... 14

*Sanders v. Dooly Cnty.*,
245 F.3d 1289 (11th Cir. 2001) ... 11

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ... 15, 16

*Toney v. White*,
488 F.2d 310 (5th Cir. 1973) ... 11

*Trump v. Biden*,
--- N.W.2d ---, 2020 WL 7331907 (Wis. Dec. 14, 2020) ... 25

*United States v. New Mexico Env't Dep't*,
No. CV 19-46, 2020 WL 1536151 (D.N.M. Mar. 31, 2020) ... 21

*Vinyard v. King*,
655 F.2d 1016 (10th Cir. 1981) ... 22

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988) ... 18

*White v. Colorado*,
82 F.3d 364 (10th Cir. 1996) ... 10

**TABLE OF AUTHORITIES**

**Page(s)**

*Wis. Voters All. v. Wis. Elections Comm'n*,
No. 2020AP1930-OA (Wis. Dec. 4, 2020) (Hagedorn, J., concurring) ... 12

*Wood v. Raffensperger*,
-- F.3d --, 2020 WL 7094866 (11th Cir. Dec. 5, 2020) ... 2, 9, 10

*Wood v. Raffensperger*,
No. 1:20-cv-04651-SDG, 2020 WL 6817513 (N.D. Ga. Nov. 20, 2020) ... 12, 25

*Wyoming v. U.S. Dep't of Agric.*,
414 F.3d 1207 (10th Cir. 2005) ... 9

*Wyoming v. U.S. Dep't of Interior*,
839 F.3d 938 (10th Cir. 2016) ... 23

**STATUTES**

3 U.S.C. § 5 ... 6, 16

3 U.S.C. § 6 ... 6

3 U.S.C. § 7 ... 7

3 U.S.C. §§ 9-10 ... 7

3 U.S.C. § 10 ... 1

N.M.S.A. 1978 §§ 1-13-13 – 15 ... 6

N.M.S.A. 1978 § 1-2-1(B)(1) ... 4, 24

N.M.S.A. 1978 § 1-6-5.7 ... 12

N.M.S.A. 1978 § 1-6-9(D) ... 21

N.M.S.A. 1978 § 1-6-9(E) ... 5, 7, 21

N.M.S.A. 1978 § 1-12-8.2 ... 17

N.M.S.A. 1978 § 1-12-8.2(B) ... 17

N.M.S.A. 1978 § 1-12-72 ... 10, 24

N.M.S.A. 1978 § 1-12-72(O) ... 3

N.M.S.A. 1978 § 1-12-72(A) ... 3

**TABLE OF AUTHORITIES**

**Page(s)**

N.M.S.A. 1978 § 1-13-15 .......... 6

N.M.S.A. 1978 § 1-14-1 .......... 7, 19

N.M.S.A. 1978 § 1-14-3 .......... 20

N.M.S.A. 1978 § 1-14-3 .......... 19

N.M.S.A. 1978 § 1-14-4 .......... 19

N.M.S.A. 1978 § 1-14-14 .......... 7

N.M.S.A. 1978 § 1-15-5 .......... 7

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(6) .......... 23

U.S. Const. art. II, § 1, cl. 2 .......... 23

Intervenor-Defendant DNC Services Corporation/Democratic National Committee (the "DNC") submits this motion to dismiss in its entirety and with prejudice the First Amended Complaint ("Complaint") filed by Donald J. Trump for President, Inc. (the "Campaign").

## I. INTRODUCTION

On December 14, 2020, the 538 Presidential Electors from each of the 50 states and the District of Columbia met to cast their votes for President and Vice President in accordance with federal law. *See* 3 U.S.C. § 10. A total of 306 of those Electors cast their ballots for President-elect Joe Biden and Vice President-elect Kamala Harris, putting them well above the 270 required to guarantee their election. But even that final act has not stopped the losing candidate, current President Donald Trump, his Campaign, and his allies from continuing their increasingly desperate and apparently bottomless anti-democratic efforts to overturn the election.

The Campaign filed this action on the same day that the Presidential Electors met. Although unsupported by law, fact, or equity, the Campaign seeks a federal court order either (1) staying the disposition of the vote of New Mexico's five electoral votes until this Court has ordered State officials to investigate and discard ballots that the Campaign contends were placed in unlawful and unsecured drop boxes, or (2) to "vacate" Joe Biden and Kamala Harris's 11-percentage-point victory in New Mexico and "remand" the assignment of New Mexico's five presidential electors to the state legislature (which has itself not complained of constitutional or statutory violations in the administration of the 2020 election). This lawsuit is merely the latest in what has been a truly astonishing effort to reverse the President's resounding defeat at the ballot box via judicial fiat. When it became clear that the American people had denied him a second term, the President and his allies began filing a torrent of lawsuits in multiple states, raising specious claims challenging

the election results and seeking similarly extraordinary and unprecedented relief. None have been successful. As of this filing, President Trump and his allies have racked up *nearly 60 losses* in post-election cases they have brought or supported. Universally, courts have resoundingly rejected as unfounded their claims that the results of the presidential election are somehow tainted or inaccurate and denied their requests that the judiciary interfere, repeatedly describing them as "unprecedented," "extraordinary," contrary to the public interest, and lacking in any evidentiary basis.[1] *See, e.g.*, *Wood v. Raffensperger*, -- F.3d --, 2020 WL 7094866, at *3 (11th Cir. Dec. 5, 2020); *Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 Fed. App'x 377 (3d Cir. Nov. 27, 2020); *Bowyer v. Ducey*, -- F. Supp. 3d --, 2020 WL 7238261, at *1 (D. Ariz. Dec. 9, 2020); *King v. Whitmer*, -- F. Supp. 3d --, 2020 WL 7134198, at *13 (E.D. Mich. Dec. 7, 2020); *Donald J. Trump for President, Inc. v. Boockvar*, -- F. Supp. 3d --, 2020 WL 6821992, at *1 (M.D. Pa. Nov. 21, 2020).

The only way that the present Complaint is meaningfully different is that it comes *nearly six weeks after the election*, even later than those other cases (which courts already found were filed far too late). Its main focus, moreover, is on guidance that the New Mexico Secretary of State issued *prior to the election*, and which was the subject of since-dismissed state litigation that was filed in October by the Republican Party of New Mexico. In fact, the Campaign's newly-filed Complaint borrows, word-for-word, passages from that prior state court complaint. *Compare*

---

[1] Shortly before the filing of this motion, the Campaign filed an amended pleading, ECF No. 9, adding allegations referencing the use of Dominion Voting machines—but any purported problems with the machines refer to their use *in Michigan*. *See* ECF No. 9-1 (Ramsland Aff.). The Campaign fails to plausibly tie any of these allegations to the election in New Mexico. Nor do the new allegations change the Campaign's sole claim—brought under the Electors Clause—or materially change the requested relief.

Complaint ("Compl.") ¶¶ 29-31, *with RPNM v. Oliver*, No. D-101-cv-2020-02344, Complaint at 5-7 (1st Dist. Ct. N.M. Oct. 26, 2020). In other places, the Campaign's Complaint similarly copies and pastes liberally from uniformly failed pleadings that President Trump and his allies have filed elsewhere, including passages that are of no relevance here. Just as in each of those cases, the Campaign has no plausible road to success. The Complaint should be dismissed in its entirety, with prejudice.

## II. BACKGROUND

### A. The Secretary of State issued guidance in September regarding the use of secure drop boxes to reduce the risk of COVID-19 transmission at polling places.

New Mexico overcame challenges posed by the COVID-19 pandemic in administering the 2020 election because the elected branches of government cooperated to implement changes, including by approving of the use of secure ballot drop boxes to facilitate physical distancing and other public health measures at polling places. Soon after the pandemic took hold, the New Mexico Legislature enacted legislation specifically amending the Election Code giving state officials clear power to promulgate measures to ensure that the state's voters would be able to exercise their right to vote securely while also protecting public health. Among other things, the Legislature explicitly empowered the Secretary of Health to "issue public health orders regarding the conduct of the 2020 general election." N.M.S.A. 1978 § 1-12-72(O). The legislation further provided that upon issuance of such order "the secretary of state shall . . . implement changes in the conduct of the 2020 general election only to the extent necessary for the preservation of [ ] health and safety." *Id*. Making the Legislature's priorities clear, the new legislation clarifies that its provisions are to be read "in harmony with the provisions of the Election Code [but] if a direct conflict exists," the new provisions apply. *Id.* § 1-12-72(A).

On September 3, Secretary of Health Kathyleen M. Kunkel issued a Public Health Order ("PHO") permitting "election-related facilities to operate subject to certain requirements designed to mitigate the risk of spreading COVID-19 through in-person voting," and requiring Secretary of State Toulouse Oliver to "provide additional guidance to facilitate and ensure compliance with such protocols to *limit the amount of voters in a polling location at one time*." N.M. Dep't of Health, *Public Health Emergency Order Clarifying that Polling Places Shall be Open as Required in the Election Code and Imposing Certain Social Distancing Restrictions on Polling Places* (Sept. 3, 2020) ("DOH PHO"), https://cv.nmhealth.org/wp-content/uploads/2020/09/090320-PHO.pdf. *See also RPNM v. Oliver*, No. D-101-cv-2020-02344, Complaint Ex. A (emphasis added).

In response to the PHO, and amid growing concerns about the pandemic, the Secretary of State issued "Standards and Guidance" encouraging the use of drop boxes by New Mexico's County Clerks as a means of reducing congestion at in-person polling locations and, "to support the health and safety of those communities impacted by the global pandemic." N.M. Sec'y of State, General Election 2020 Drop Box Standards and Guidance 1 (Sept. 9, 2020) (the "Guidance"), Compl. Ex. 3, ECF No. 1-6 at 1. The Guidance notes that the Election Code permits absentee voters to "return their ballots at any voting location through Election Day," *id.* at 2 (citing N.M.S.A. 1978 1-6-9(D)), and emphasizes various "minimum requirements for securing and maintaining drop boxes" that counties are encouraged to use for this purpose. *Id.* at 2-3. The Secretary of State, who serves as New Mexico's chief elections official and is charged with "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of the Election Code" by the counties, N.M.S.A. 1978 § 1-2-1(B)(1), determined that drop boxes present "a secure, convenient alternative for voters to cast their completed mail ballots while ensuring they

are received by the deadline." Guidance at 1. In a later "Voter Information Advisory" (issued October 14, 2020) regarding permissible activities at polling place locations, including ballot drop boxes, the Secretary of State reiterated that drop boxes are subject to various rules and security measures including "at least two workers supervising them at all times." Compl. Ex. 4, ECF No. 1-7 at 2.

**B. In October, the New Mexico Republican Party filed a lawsuit challenging the guidance.**

On October 26, 2020, the Republican Party of New Mexico sued the Secretary in the First Judicial District Court of New Mexico, taking issue with her classification of drop boxes as "in person" ballot return and suggesting that ballot boxes should be treated like "secure containers" under N.M.S.A. 1978 § 1-6-9(E). *See RPNM*, No. D-101-cv-2020-02344, Complaint at 1. Although the Republican Party admitted that it has "generally been game to consider drop boxes [] permissible" under that provision of the Election Code, it argued that the court should instruct the counties to ensure that all drop boxes followed the separate security measures specified in Section 1-6-9(E), which it alleged were different than those outlined in the Secretary of State's Guidance. *Id.* at 7. Just days after filing suit, and before the court considered the pleadings or other briefing, the Republican Party agreed to voluntarily withdraw its motion for a temporary restraining order so long as the Secretary re-published the Guidance for the counties. *See RPNM v. Oliver*, No. D-101-cv-2020-02344, Notice of Withdrawal of TRO Motion on Consensual Resolution (Oct. 29, 2020). The state court then held that there was no "live controversy" over drop boxes and dismissed the case. *RPNM v. Oliver*, No. D-101-cv-2020-02344, Order of Dismissal (Oct. 30, 2020).

The Campaign did not intervene, object, or file a separate suit challenging the Guidance, and there was no further litigation regarding drop boxes for the 2020 election. In fact, the Secretary of State understood the RPNM's withdrawal as an "acknowledgement that . . . drop boxes are legal under New Mexico law and that it was absolutely appropriate for the Secretary of State to provide this safe and efficient option for voters to make their voice heard in the 2020 General Election." [2] For its part, after the lawsuit had been dismissed, the Republican Party indicated it would revive the litigation in state court *after* the 2020 General Election.[3]

**C. President-elect Biden and Vice President-elect Harris won the popular vote in New Mexico by nearly 11 percentage points in the November general election.**

The November 3rd election proceeded as planned. More than 900,000 New Mexicans cast their ballots, including more than 300,000 absentee voters. In accordance with New Mexico law, each county canvassing board approved their vote tallies and issued certificates of canvass to the Secretary. *See* N.M.S.A. 1978 §§ 1-13-13 – 15. On November 24, the New Mexico Canvassing Board met to certify the State's official results. *See* N.M.S.A. 1978 § 1-13-15. President-elect Joe Biden and Vice President-elect Kamala Harris received 501,614 votes (54.3%) of the votes for President and Vice President, compared to only 401,894 (43.5%) votes for Donald Trump and Mike Pence. That same day, the Secretary of State reported that the State's mandatory audit of the election results turned up only "very minor findings" such as garden-variety hand-counting and voting-system errors, confirming Biden's victory.[4] New Mexico then delivered "to the Archivist

---

[2] Dan Boyd, *NM Ballot Dispute Resolved - For Now*, Albuquerque J. (Oct. 29, 2020), https://www.abqjournal.com/1512420/nm-ballot-box-lawsuit-resolved-for-now.html.

[3] *Id*.

[4] *See* Susan Montoya Bryan, *Canvassing Board Certifies Joe Biden's Win in New Mexico*, Associated Press, (Nov. 24, 2020), https://apnews.com/article/election-2020-joe-biden-new-mexico-coronavirus-pandemic-elections-8ad31b1f0ad59f77669063572ff6ac97.

of the United States a certificate of such ascertainment of the [presidential] electors appointed," 3 U.S.C. § 6, prior to the "safe harbor" deadline of December 8, 2020, which binds the U.S. Congress to the certified results of New Mexico's election. *See* 3 U.S.C. § 5.

Although State law permits any candidate to request a recount or file an election contest, *see* N.M.S.A. 1978 §§ 1-14-1, 1-14-14, neither was requested for the presidential election. Bringing finality to New Mexico's presidential election, New Mexico's slate of Presidential Electors met on December 14, as prescribed by federal and state law, to cast their ballots for Joe Biden and Kamala Harris, *see* 3 U.S.C. § 7, and "forward the certificates so made by them" to the parties required by federal law. *See* 3 U.S.C. §§ 9-10; *see also* N.M.S.A. 1978 § 1-15-5.[5]

### D. The Campaign waited to file this lawsuit until December 14, the day the Electoral College met.

Since it became clear Donald Trump lost the 2020 election, the Campaign and its allies have filed dozens of lawsuits around the country collectively seeking to disenfranchise many millions of voters and overturn the results. This lawsuit is the latest such effort, and it recycles many of the same arguments rejected in other failed actions. While hardly a model of clarity, the Complaint appears to assert only a singular claim premised on an alleged usurpation of the New Mexico Legislature's authority by the Secretary of State in issuing guidance and standards pertaining to the counties' use of drop boxes for the 2020 election. *See* Compl. ¶¶ 106-113. The Complaint imports wholesale (word-for-word) arguments asserted by the Republican Party of New

---

[5] The United State Archives publishes photocopies of the states' finalized certificates of ascertainment and certificates of vote provided by the presidential electors. U.S. Archives, *Electoral College Results* (2020), https://www.archives.gov/electoral-college/2020. New Mexico's certificates indicate that all five of its electoral votes were cast for President-elect Biden. U.S. Archives, *Electoral College Results* (2020), https://www.archives.gov/files/electoral-college/2020/vote-new-mexico.pdf.

Mexico in the state court action that they brought (and voluntarily dismissed) *prior* to the election. *See* Compl. ¶¶ 29-31. Specifically, it argues that the Secretary should have classified ballot drop boxes as "secure containers" under N.M. Stat. § 1-6-9(E) instead of interpreting the use of drop boxes as "in person" ballot drop offs, an interpretation that the Campaign contends constitutes a violation of the Electors Clause. Compl. ¶¶ 20, 22.

The Campaign alleges that, to remedy these purported violations, the Court should stay the disposition of the New Mexico Presidential Electors' votes until election officials selectively discard the absentee votes that the Campaign does not believe were adequately monitored, or, in the alternative, "vacate" Joe Biden and Kamala Harris's 11-percentage-point electoral victory and "remand" the allocation of presidential electors to the New Mexico Legislature (which has itself not complained of constitutional or statutory violations in the administration of the 2020 Election). *See* Compl. ¶¶ 1, 72, 113, B-D.

## III. LEGAL ARGUMENT

The Complaint, filed more than a month after the presidential election and on the same day New Mexico's electors cast their ballots, should be dismissed for mootness and laches. Moreover, it asserts an illogical theory premised on the Electors Clause that the Campaign has no standing to assert in federal court, especially after the Electoral College has now signed, sealed, and delivered its Certificate of Vote. The case should be dismissed in its entirety.

### A. The Campaign's claim is moot.

#### 1. There is no live controversy because the Electoral College already finalized the 2020 Presidential Election.

This case should be dismissed in the first instance because it is moot. "'Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite

to federal court jurisdiction.'" *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005) (quoting *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996)). "'Without a live, concrete controversy, we lack jurisdiction to consider claims no matter how meritorious.'" *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1223 (10th Cir. 2008) (quoting *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007)). "The crucial question is whether granting a present determination of the issues offered will have some effect in the real world." *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005) (citation omitted).

The Campaign asks this Court to stay the disposition of New Mexico's Certificate of Vote, which has been endorsed by New Mexico's five Presidential Electors. The Campaign also seeks other extraordinary relief, including orders directing officials to implement investigations of drop box locations and "invalidation of all of the results from whatever the smallest block of absentee ballots is that can be precisely matched to its election results." Compl. B-E. But the general election has been over for more than a month and a half. The Canvassing Board certified the state's final vote on November 24 in accordance with New Mexico law, allowing the state to take advantage of the federal "safe harbor" deadline. *See infra*, Section III.C.2. There is no longer any controversy for this Court to resolve because the votes have been counted, and the Electoral College has spoken. *See, e.g.*, *Wood*, 2020 WL 7094866, *6 ("We cannot turn back the clock and create a world in which the 2020 election results are not certified." (internal quotation marks and citation omitted)); *Feehan v. Wis. Elections Comm'n*, No. 20-CV-1771-PP, 2020 WL 7250219, at *14 (E.D. Wis. Dec. 9, 2020) ("[T]he relief the plaintiff seeks is beyond this court's ability to redress absent the mythical time machine."). The voters in the United States, and in New Mexico, have

chosen Joe Biden and Kamala Harris as their next President and Vice-President—a now historical fact the Campaign cannot change, least of all through this lawsuit.

**2. The Campaign's claim does not fall within an exception to mootness.**

Perhaps seeing the writing on the wall, the Campaign makes the incredible assertion that "even the swearing in of the next President on January 20, 2021, will not moot this case because review could outlast even the selection of the next President under the capable of repetition, yet evading review doctrine." Compl. ¶ 75. This doctrine is wholly inapplicable here. That exception "is only to be used in 'exceptional situations,'" *White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996) (citations omitted), and it requires that a plaintiff demonstrate that "(1) the duration of the challenged action is too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party . . . [will] be subjected to the same action again," *Chihuahuan Grasslands All. v. Kempthorne*, 545 F.3d 884, 892 (10th Cir. 2008) (citations omitted). This exception does not apply "if there is some alternative vehicle through which a particular policy may effectively be subject to complete review." *See, e.g.*, *Wood*, 2020 WL 7094866, at *7 (internal quotation marks and citations omitted).

Here, the Campaign's requested injunctive relief is limited to the 2020 general election, which will never occur again. Moreover, the Secretary issued the drop box guidance pursuant to a statute and order that were each expressly limited to the November 2020 general election. Section 1-12-72 only "regulates the conduct of the 2020 general election" and is repealed effective December 31, 2020, and the September 3 PHO likewise applies only to the November 2020 general election. *See* N.M.S.A. 1978 § 1-12-72; DOH PHO. The relief sought by the Campaign is therefore not "capable of repetition."

Mootness here is a creature of the Campaign's making: despite the public nature of the Guidance and the prior litigation by the Campaign's affiliated party, the Campaign chose to wait to complain about New Mexico's drop boxes until long after the election, on the same day that the Electoral College ended the presidential selection process. Of course, that intentional delay does not portend that similar future cases will also evade review if timely filed. The "capable of repetition, yet evading review" exception to mootness does not apply.

**B. The Campaign's claims are barred by laches.**

The Campaign's claims are separately and independently barred by laches. "Laches consists of two elements: (1) inexcusable delay in instituting a suit; and (2) resulting prejudice to defendant from such delay." *Kadonsky v. United States*, 3 F. App'x 898, 904 (10th Cir. 2001) (citations omitted). Both elements are plainly present here.

In the context of election challenges, "the law imposes the duty on parties having grievances . . . to bring the grievances forward for pre-election adjudication." *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973). Indeed, "the failure to require prompt pre-election action in such circumstances as a prerequisite to post-election relief," "may permit, if not encourage, parties who could raise a claim 'to lay by and gamble upon receiving a favorable decision of the electorate' and then, upon losing, seek to undo the ballot results in a court action." *Id*. (citations omitted). Consequently, numerous courts have denied relief in election-related cases due to laches or similar considerations. *See, e.g., Sanders v. Dooly Cnty.*, 245 F.3d 1289, 1291 (11th Cir. 2001) (affirming finding that inexcusable delay prejudiced defendants and citizens); *Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 421-22 (6th Cir. 2020) (upholding district court's dismissal of challenge to election procedures based on laches); *Perry v. Judd*, 471 F. App'x 219, 224 (4th Cir. 2012)

(affirming holding of inexcusable delay for candidates who waited until after petition deadline to bring constitutional challenge). As the Pennsylvania Supreme Court held recently in rejecting, on laches grounds, a similar post-election challenge that sought to retroactively disenfranchise 2.6 million voters who cast their ballots by mail, "The want of due diligence demonstrated in this matter is unmistakable." *Kelly v. Pennsylvania*, No. 68 MAP 2020, 2020 WL 7018314, at *1 (Pa. Nov. 28, 2020).

Likewise, the Campaign's considerable delay is inexcusable and warrants dismissal. The Campaign challenges guidance publicly issued on September 9, 2020, almost *two months* before the November general election. Compl. ¶ 30. The guidance states that the locations of the drop boxes would be posted 21 days before the general election, ECF No. 1-6 at 4, and early voting in New Mexico began on October 6, N.M.S.A. 1978 § 1-6-5.7. Thus, the drop boxes were in active use for *weeks* before the election, but the Campaign never raised this issue and identifies no reason why it could not have challenged the Guidance *before* the election, as the State Republican Party did. The Campaign had ample time to raise concerns about the Guidance at the time it was issued in September, during the weeks-long period during which voters and county officials were actively using the drop boxes, or even as intervenors into the lawsuit brought by the State Republican Party. But the Campaign stayed silent before the election and remained silent during the days and weeks after the election when the State was canvassing and tallying the votes.

The Campaign offers no explanation for its delay—and certainly not one that would change the result considering the prejudice to Defendants and the hundreds of thousands of New Mexico voters who dutifully cast their votes according to and in reliance on the rules and practices established well before the election. *See Wood v. Raffensperger*, No. 1:20-cv-04651-SDG, 2020

WL 6817513, at *8 (N.D. Ga. Nov. 20, 2020) (post-election interference will "erode [] confidence in the electoral process"); *see also* Order, *Wis. Voters All. v. Wis. Elections Comm'n*, No. 2020AP1930-OA, at 3 (Wis. Dec. 4, 2020) (Hagedorn, J., concurring) ("Once the door is opened to judicial invalidation of presidential election results, it will be awfully hard to close that door again. . . . The loss of public trust in our constitutional order resulting from the exercise of this kind of judicial power would be incalculable.").

The Campaign waited until it saw New Mexico's election results—and then a few weeks more—and now seeks to retroactively change the election rules and to disenfranchise scores of voters who cast their mail ballots in reliance on the availability of drop boxes. That prejudice is extreme, and this Court should find that laches firmly bars this action. *See, e.g.*, *King*, 2020 WL 7134198, at *7 (finding plaintiffs "showed no diligence" in asserting their claims when they waited more than 21 days after the 2020 General Election to assert their claims); *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) ("In the context of elections . . . any claim against a state electoral procedure must be expressed expeditiously" because, "[a]s time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made.").

### C. The Campaign lacks standing because it asserts only generalized grievances rather than a cognizable injury.

The Campaign also lacks standing to sue, as it has neither pleaded nor suffered a cognizable injury-in-fact and instead asserts only generalized grievances about Defendant's supposed defiance of state law that are not redressable in any event. "The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'"

*Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). To have Article III standing, a party must "allege (1) a concrete and particularized actual or imminent injury, (2) which is fairly traceable to defendant's conduct, and (3) which a favorable court decision will redress." *Sac & Fox Nation of Mo. v. Pierce*, 213 F.3d 566, 573 (10th Cir. 2000). Prudential considerations require that a party "assert its own rights, rather than those belonging to third parties." *Id*. (quoting *Warth*, 422 U.S. at 499). The Campaign satisfies none of these criteria.

**1. Plaintiff has not suffered a cognizable injury under the Electors Clause.**

The Campaign has not established that it has or will suffer an injury in fact. The Campaign must show an "invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Bd. of Cnty. Comm'rs of Sweetwater Cnty. v. Geringer*, 297 F.3d 1108, 1112 (10th Cir. 2002) (citations omitted). An allegation "that the law . . . has not been followed[,]"is "the kind of undifferentiated, generalized grievance about the conduct of government" that does not suffice for standing. *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

The Campaign conspicuously fails to allege *any* injury that it has suffered or will suffer. Indeed, the Complaint's only direct references to injuries are in paragraphs 59-70, and those injuries relate only to *the State of New Mexico*. But the State of New Mexico is *not* the plaintiff here, and at no point does the Campaign attempt to link a direct injury to itself. The Complaint boils down to meritless allegations that the Secretary failed to follow the law, which even if true, are the sort of generalized grievances that courts universally reject as insufficient to establish Article III standing. *See Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 360 (3d Cir. 2020)

(rejecting the "logical conclusion of the Voter Plaintiffs' theory [] that whenever an elections board counts any ballot that deviates in some way from the requirements of a state's legislatively enacted election code, there is a particularized injury in fact sufficient to confer Article III standing"); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); *Pirard v. City of Albuquerque*, No. 1:15-CV-00707MCA-WPL, 2016 WL 10720981, at *4 (D.N.M. Feb. 10, 2016) (granting motion to dismiss where plaintiff's alleged injuries were "shared by American citizens regarding civil rights violations committed by APD," and therefore amounted to generalized grievances).

This is particularly true in the Electors Clause context. As the Third Circuit recently explained, plaintiffs lack standing when the only harm they claim is to their interest in proper application of the Elections Clause because "[t]heir relief would have no more directly benefitted them than the public at large." *Bognet*, 980 F.3d at 349. Given the functionally identical roles that the Elections and Electors Clauses serve, with the former setting the terms for congressional elections and the latter implicating presidential elections, *see Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (Roberts, C.J., dissenting) (noting the Electors Clause is "a constitutional provision with considerable similarity to the Elections Clause"), this same logic applies equally to the Electors Clause.

**2. The Campaign's purported injury is not redressable by this Court.**

The Campaign also fails to allege that its sought-after relief would redress the purported injuries, and any such allegation would be futile in any event, as federal law precludes this type of post-election challenge this late in the game. Redressability is "a likelihood that the requested relief

will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). If the relief sought would not "likely remedy [a plaintiff's] alleged injury in fact," the plaintiff lacks standing. *Id.* at 109.

Even if the Campaign had identified a cognizable injury, it would not be redressable because New Mexico certified its election before the federal "safe harbor" deadline and the Electoral College has voted and sealed the state's Certificate of Vote. As a result, federal law and Supreme Court precedent preclude any claim seeking to change or reverse the selection of the State's Presidential Electors. The "safe harbor" deadline set by federal law requires Congress to accept a state's slate of presidential electors and the state's votes in the electoral college if (1) the electors are chosen under laws enacted prior to Election Day, and—most relevant to the present litigation—(2) a final determination is reached as to the identity of those electors six days before the Electoral College meets. 3 U.S.C. § 5. By its terms, a state met the "safe harbor" deadline this year if there was a "final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures" by December 8, 2020. *Id.* Because the outcome of the presidential election was certified by the State Canvassing Board in accordance with state law well before that date, *see supra* Part II, New Mexico's Electors are protected by the "safe harbor."

The Supreme Court has held that courts may not jeopardize a state's ability to meet the safe harbor deadline. In *Bush v. Palm Beach County Canvassing Board*, 531 U.S. 70 (2000) (per curiam) ("*Bush I*"), the Supreme Court confirmed that the safe harbor "assure[s] finality of the State's determination" of its choice of electors if a state fulfills § 5's requirements, and strongly implied that state courts should consider a state's interests in "tak[ing] advantage of the 'safe

harbor'" in adjudicating post-election litigation. *Bush I*, 531 U.S. at 78. As one court has explained, the "safe harbor provision prevents endless litigation over election results." *Rios v. Blackwell*, 433 433 F. Supp. 2d 848, 850 (N.D. Ohio 2006). In short, because the "safe harbor" date has come and gone, federal law does not permit this Court to allow this action to jeopardize the votes of New Mexico's Presidential Electors.

Even if the Court could grant the Campaign *some* relief, it would not change the outcome. Indeed, the Campaign admits that its desired relief might not affect the results of the Presidential race in New Mexico. Compl. ¶ 71 ("For example, they may review the presidential election results in their State and determine that winner would be the same[.]"). This is hardly surprising because nothing in the Complaint suggests that the votes the Campaign wants to invalidate were for President-Elect Biden. And the Campaign fails to establish that it is even possible to trace the *actual ballots* back to ballot envelopes collected from the challenged drop boxes once absentee ballots have been separated from their envelopes.[6] Moreover, the Campaign does not allege, much less demonstrate, that its alternative relief (to "vacate" and "remand" selection of the Presidential Electors to the New Mexico Legislature, Compl. ¶ 113) would result in a different slate of Electors who would cast their ballots for Donald Trump. And even if the relief sought *could* somehow result in a change to New Mexico's slate of Electors, the Campaign does not and cannot allege that a

---

[6] The Campaign mischaracterizes N.M.S.A. 1978, 1-12-8.2(B). In the Complaint, the Campaign states that this section requires a presiding judge to "note on the ballot" that a voter delivered an absentee ballot in person. Compl. ¶ 28. This is *not what this section says*. Section 1-12-8.2 allows a voter to deliver an absentee ballot *in its envelope* to any polling location, and the presiding judge will note that the voter delivered her ballot envelope. However, "[t]he official mailing envelope shall not be opened but shall be placed in an envelope provided for delivery to the county clerk. The precinct board shall deliver the unopened official mailing envelopes to the county clerk before midnight on election day." N.M.S.A. 1978 § 1-12-8.2(B).

change to New Mexico's five Electors could possibly alter the outcome of the presidential race, which President-elect Biden and Vice President-elect Harris won by 74 electoral votes.

**3. The Campaign lacks prudential standing because its claims rest on the legal rights of others.**

The Campaign also lacks prudential standing to bring an Electors Clause claim because its claims "rest . . . on the legal rights or interests of third parties.'" *See Kowalski*, 543 U.S. at 129 (quoting *Warth*, 422 U.S. at 499). "Even if an injury in fact is demonstrated, [] a party may assert only a violation of its own rights." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988); *Hill v. Warsewa*, 947 F.3d 1305, 1309-1310 (10th Cir. 2020).

The Campaign predicates its Electors Clause claim solely on the State of New Mexico's rights, or, read liberally, on the rights of voters at large. *See* Compl. ¶¶ 48, 74. Indeed, "the Elections Clause claims asserted in the . . . verified complaint belong, if they belong to anyone, only to the [New Mexico] General Assembly." *Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018), *appeal dismissed sub nom. Corman v. Sec'y Commonwealth of Pa*., 751 F. App'x 157 (3d Cir. 2018). Of course, the Campaign cannot assert the rights of New Mexico because it neither has a close relationship with the State nor has identified a "'hindrance' to the [State's] ability to protect [its] own interests." *Kowalski*, 543 U.S. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). And any interest in protecting the rights of the voters at large further proves that the injuries here (if there are any) are generalized grievances. *Supra* Part III.C.1.

**D. The Court does not have jurisdiction over this lawsuit.**

**1. New Mexico election contests must be brought in state district court.**

Even if the Campaign had a colorable basis for challenging the election (it does not), such a challenge must be brought in state court. Though not styled as an election contest, the Complaint

seeks the kind of relief only contemplated by New Mexico's election contest statutes, and by bringing this claim in federal court, the Campaign attempts an end run around New Mexico's Election Code. *Dinwiddie v. Bd. of Cnty. Comm'rs of Lea Cnty*., 1985-NMSC-099, ¶ 9, 103 N.M. 442, 445, 708 P.2d 1043, 1046 ("The right to contest an election is entirely statutory. . . The statutory provisions for an election contest must be strictly followed. One has the right to contest an election only in the manner and to the extent prescribed by statute." (citations omitted)); *Glaser v. LeBus*, 2012-NMCA-028, ¶¶ 20-25, 274 P.3d 114, 120–22, *opinion adopted*, 2012-NMSC-012, ¶ 18, 276 P.3d 959 (holding that a complaint presents an election contest and therefore must follow the Election Code even if not presented formally as an election contest).

New Mexico allows "any" unsuccessful candidate "to any public office" to contest an election. N.M. Stat. 1978 § 1-14-1; *see also Glaser*, 274 P.3d 114 at 119–20 ("[A]ny challenge as to the underlying validity of an election that would necessarily require overturning the results or effects of an election is an election contest subject to the Election Code's election contest procedures."). Election contests must include a "verified complaint of contest" and must be filed in "the district court of the county where either of the parties resides." *Id.* § 1-14-3. Moreover, election contests are decided "in favor of the party for whom a majority of the legal votes shall be proven to have been cast." *Id*. § 1-14-4. To be sure, though federal courts generally do not interfere with state elections, *Curtis v. Oliver*, No. CIV 20-0748 JB\JHR, 2020 WL 4734980, at *64 (D.N.M. Aug. 14, 2020), they will do so "in the exceptional case where a state's voting system is fundamentally unfair." *Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1034 (D.N.M. 2016) (citing *Warf v. Bd. of Elections of Green Cnty., Ky*., 619 F.3d 553, 559 (6th Cir. 2010)). But federal

courts are cautious to avoid deciding state election contests challenging "garden variety election irregularities." *Id*. at 1035.

The Campaign erred in bringing this contest in federal court and, in any event, failed to include a properly verified complaint. This lawsuit challenges the outcome of the election because, according to the Campaign, the Secretary did not have authority to issue guidance regarding the drop boxes, and the drop boxes used in the general election were not properly secured. *See generally* Compl. These are not issues of fundamental unfairness; in fact, none of these allegations call into question whether President-elect Biden won the majority of legal votes, which he did. *See Curtis*, 2020 WL 4734980, at * 65 (finding no fundamental unfairness when party fails to show an election error "permeated throughout the state."); *Logan*, 163 F.Supp3d at 1035 (refusing to "enter into the details of the administration of the election" when the allegations involved "highly technical details" and where the election followed uniform rules, standards, and procedures). The Campaign merely challenges ballot repositories, which is a garden variety election irregularity reserved to the state to decide, as the state Republican Party recognized when bringing this exact issue in state court in October. *See Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986) ("Only in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation.").

Moreover, any election contest must be verified. N.M. Stat. 1978 § 1-14-3. But the complaint here was not: although a verification was filed, the declarant, Thomas Lee, stated only that he "reviewed the allegations" in the Complaint—he does not verify their truth. ECF No. 1-3 (declaring that it is true that he *reviewed* the Complaint but not whether the allegations in the Complaint are true and correct to the best of his knowledge). The Complaint is thus not only before

the wrong court, it is facially procedurally deficient. *Dinwiddie*, 708 P.2d 1043 at 1046 ("It has long been established in New Mexico that in election contests the statutory requirement of verification of the complaint must be met or the case is subject to dismissal[.]").

**2. The Court should abstain under the *Pullman* abstention doctrine.**

Even if this lawsuit properly challenges the use of drop boxes in the general election (it does not), the Court should decline to exercise jurisdiction over this lawsuit under the *Pullman* abstention doctrine. If anything, the Campaign's lawsuit turns on issues of state law. *Caldara v. City of Boulder*, 955 F.3d 1175, 1178 (10th Cir. 2020), *cert. denied sub nom. Caldara v. Boulder, Co.*, No. 20-416, 2020 WL 6701118 (U.S. Nov. 16, 2020) ("The policy underlying *Pullman* abstention is that federal courts should avoid 'premature constitutional adjudication,' and the risk of rendering advisory opinions." (citations omitted)); *United States v. New Mexico Env't Dep't*, No. CV 19-46 KG/SMV, 2020 WL 1536151, at *7 (D.N.M. Mar. 31, 2020) ("*Pullman* abstention is founded on the notion that federal courts should avoid unnecessary federal court review of the constitutionality of state law."). Courts consider three elements when determining whether to abstain: Whether "(1) an uncertain issue of state law underlies the federal constitutional claim; (2) the state issues are amenable to interpretation and such an interpretation would obviate the need for or substantially narrow the scope of the constitutional claim; and (3) an incorrect decision of state law by the federal court would hinder important state law policies." *New Mexico Env't Dep't*, 2020 WL 1536151, at *7. All three elements are present here.

*First*, the central contention of this Complaint is whether the drop boxes contemplated by the Secretary were "secured containers" under N.M. Stat. 1978 § 1-6-9(E) or "alternate voting locations" under N.M. Stat. 1978 § 1-6-9(D). Compl. ¶ 22. The Campaign asserts that the Election

Code differentiates these terms, going so far as to copy sections of the code, wholesale, into the Complaint. *See, e.g*., Compl. ¶ 29. The Campaign further asserts that however the drop boxes were managed, it was in violation of state election laws. Compl. ¶¶ 26, 27, 34. These issues are within the realm of state law; adjudicating them would require this Court to resolve alleged uncertainty about the contours and meaning of "drop boxes" and the election code. *Caldara*, 955 F.3d at 1179. Indeed, these allegations were in front of the state court before the Republican Party withdrew their lawsuit; that court has not had the opportunity to conclusively address the issue. *RPNM v. Oliver*, No. D-101-cv-2020-02344, Compl. at 13-14 (1st Dist. Ct. N.M. Oct. 26, 2020).

*Second*, if there are any legitimate issues here (and there are not), they are state issues that are "fairly subject" to interpretation. *Caldara*, 955 F.3d at 1181. A state court may very well decide that drop boxes fit within one of the legislature's designated categories—"secured containers" or "alternative voting locations"—or that the Secretary was authorized to create a new mail ballot repository category under her statutory power and in light of the national health crisis. *Vinyard v. King,* 655 F.2d 1016, 1020 (10th Cir. 1981) (explaining the "usual *Pullman* abstention situation" as one "where the construction of a state statute or the authority of a state agency to promulgate a regulation is at issue."). Any of these findings would moot the federal issues, removing any need for this Court to resolve the Electors Clause claim. *Caldara*, 955 F.3d at 1181.

*Third*, were this Court to wade in and determine the validity of the Secretary's guidance, it would be intruding into important state functions and implicating crucial state rights regarding how New Mexico runs an election during a global pandemic. *Caldera*, 955 F.3d at 1181. It is for New Mexico to decide, in the first instance, whether the legislature delegated authority to the Secretary to decide how to use drop boxes and whether those drop boxes were valid under the

Election Code. "[F]ederalism interests are salient in this case," and abstention will avoid "the waste of a tentative decision and any needless friction with state policies" *Id*. at 1181-82.

**E. Plaintiff has failed to state a claim upon which relief can be granted.**

Though the jurisdictional hurdles discussed above are more than enough to dismiss the Complaint, dismissal is also appropriate under Federal Rule of Civil Procedure 12(b)(6), as the Campaign has set forth neither a cognizable claim nor a possible path to relief. To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts factual allegations in the complaint as true but "do[es] not accept the nonmoving party's legal conclusions as true." *Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938, 942 (10th Cir. 2016) (quoting *Wasatch Equal. v. Alta Ski Lifts Co.*, 820 F.3d 381, 386 (10th Cir. 2016)).

**1. Plaintiff has failed to plead a claim under the Electors Clause.**

The Campaign fails to plead a viable claim under the Electors Clause. That clause vests authority in "the Legislature" of each state to direct the selection of presidential electors, U.S. Const. art. II, § 1, cl. 2. The Supreme Court has held that state legislatures can delegate this authority—including to state officials like the Secretary. *See, e.g., Ariz. State Legislature*, 576 U.S. at 807 (noting that Elections Clause does not preclude "the State's choice to include" state officials in lawmaking functions so long as such involvement is "in accordance with the method which the State has prescribed for legislative enactments") (quoting *Smiley v. Holm*, 285 U.S. 355, 367 (1932)); *Corman*, 287 F. Supp. 3d at 573 ("The Supreme Court interprets the words 'the Legislature thereof,' as used in that clause, to mean the lawmaking processes of a state.") (quoting

*Ariz. State Legislature*, 576 U.S. at 816). Accordingly, the actions of the Secretary could only constitute plausible violations of the Electors Clause if such actions exceeded the authority granted to her by the New Mexico Legislature. They plainly did not.

The Secretary of State is the state's chief elections official and has been granted by the New Mexico Legislature broad power and duties, including, among other things, "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of the Election Code" by the Counties. N.M. Stat. § 1-2-1(B)(1); *see generally id.* § 1-2-1–5 (describing supervisory, training, and advisory responsibilities). Moreover, the Secretary of State issued the Guidance in response to a PHO, which expressly directed her to take measures to limit the number of voters in a polling location at one time. N.M. Dep't of Health, *Public Health Emergency Order Clarifying that Polling Places Shall be Open as Required in the Election Code and Imposing Certain Social Distancing Restrictions on Polling Places* (Sept. 3, 2020). And that PHO, and the Secretary's response, were expressly authorized and contemplated by N.M. Stat. § 1-12-72. The Secretary was therefore not only well within her authority to issue guidance to the counties to ensure that drop boxes were used consistently and in line with the Election Code, her actions were expressly authorized by the legislature. That the Campaign now, more than three months after the fact, disagrees with the particulars of how she exercised her Guidance to carry out the Election Code and the legislative and public health mandates to reduce crowding at polling stations does not transform an untimely question of state law into a federal Election Clause claim.

**2. The Campaign is not entitled to the relief it seeks.**

While the lack of credible allegations supporting the Complaint is notable, the Campaign's disproportionate, implausible, and unconstitutional requested relief is truly remarkable. As many

Courts have recently recognized even when presented with similar requests before the "safe harbor" deadline and the meeting of the Electoral College, the type of relief the Campaign requests, is not tailored to the type of alleged violations and would violate the fundamental constitutional rights of hundreds of thousands of New Mexican voters. *See Wood*, 2020 WL 6817513, at *8 ("Underscoring the exceptional nature of his requested relief, [Plaintiff's] claims go much further; rather than changing the rules on the eve of an election, he wants the rules for the already concluded election declared unconstitutional and over one million absentee ballots called into question. Beyond merely causing confusion, [Plaintiff's] requested relief could disenfranchise a substantial portion of the electorate and erode the public's confidence in the electoral process."), *aff'd*, No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020); *Feehan*, 2020 WL 7250219, at *18 ("Granting the relief the plaintiff requests would take the court far outside . . . the limits of its oath to uphold and defend the Constitution."); *see also Kelly v. Commonwealth*, 2020, 2020 WL 7018314, at *1 (rejecting request to remand appointment of presidential electors to the Pennsylvania General Assembly because doing so would "result in the disenfranchisement of millions of Pennsylvania voters"); *Trump v. Biden*, --- N.W.2d ---, 2020 WL 7331907, at *7 (Wis. Dec. 14, 2020) ("The Campaign is not entitled to relief, and therefore does not succeed in its effort to strike votes and alter the certified winner of the 2020 presidential election.").

Only the most egregious elections misconduct could even conceivably justify the mass disenfranchisement Plaintiff seeks. *See McMichael v. Napa Cnty.*, 709 F.2d 1268, 1273–74 (9th Cir. 1983) (Kennedy, J., concurring) (invalidation of election results "has been reserved for instances of willful or severe violations of established constitutional norms"). This is particularly so in New Mexico where, even in timely state-court election contest proceedings, the State

Supreme Court has refused to void absentee ballots that were returned in a manner not explicitly authorized by the Election Code. *See Kiehne v. Atwood*, 604 P.2d 123, 134 (N.M. 1979) (reversing trial court's invalidation of ballots returned by third party). The Campaign's allegations, even if taken as true, fall far short of justifying wholesale disenfranchisement of hundreds of thousands of New Mexico voters. As a federal court in Pennsylvania observed when confronted with yet another of the Campaign's outrageous requests to overturn an election, "One might expect that when seeking such a startling outcome, a plaintiff would come formidably armed with compelling legal arguments and factual proof of rampant corruption, such that this Court would have no option but to regrettably grant the proposed injunctive relief despite the impact it would have on such a large group of citizens." *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-CV-02078, 2020 WL 6821992, at *1 (M.D. Pa. Nov. 21, 2020), *aff'd sub nom. Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020). There, as here, "[t]hat has not happened. Instead, this Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence. In the United States of America, this cannot justify the disenfranchisement of a single voter[.]" *Id.*

## IV. CONCLUSION

The DNC respectfully requests that the Court dismiss Plaintiff's Complaint in its entirety and with prejudice.

Dated: January 8, 2021

Respectfully submitted,

/s/ Paul Melendres

Paul Melendres #12399
Melissa Calderon #141511
MELENDRES & MELENDRES PC
1017 5TH Street NW
Albuquerque, NM 87102
Telephone: (505) 243-8310
paul@melendreslaw.com
melissa@melendreslaw.com

Marc E. Elias
Emily Brailey
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005
Telephone: (202) 654-6200
MElias@perkinscoie.com
EBrailey@perkinscoie.com

Matthew P. Gordon
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
MGordon@perkinscoie.com

Torryn Taylor Rodgers
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105
Telephone: (415) 344-7000
TRodgers@perkinscoie.com

*Counsel for Intervenor-Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: January 8, 2021

Respectfully submitted,

*/s/ Melissa Calderon*